UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| SECURITIES & EXCHANGE COMMISSION, | Case No. 2:16-cv-01413-JAD-PAL |
| Plaintiff, | **ORDER** |
| v. | (Mot Sanctions – ECF No. 92) |
| HEMP, INC., | (Mot Sanctions – ECF No. 97) |
| Defendants. | |

This matter is before the court on Plaintiff's Motion for Imposition of Sanctions Against Defendant Barry K. Epling for Fabrication of Evidence, and Against Defendants Barry K. Epling and Bruce J. Perlowin for False Testimony (ECF No. 92), and a second motion filed a few days later for Imposition of Sanctions Against Defendants Ferris Holding, Inc., Barry K. Epling, and Hobbes Equities, Inc. for Fabrication of Evidence (ECF No. 97). The court has considered the motions, Defendants' Responses (ECF Nos. 108, 109), Plaintiff's Replies (ECF Nos. 114, 115), the arguments of counsel at a hearing conducted February 1, 2018, and testimony and arguments taken at a day long evidentiary hearing conducted May 10, 2018.

## BACKGROUND

### I.    THE COMPLAINT

The Complaint (ECF No. 1) in this case was filed June 20, 2016. This is a civil enforcement action filed by the Securities and Exchange Commission ("SEC") relating to the defendants' involvement in what the SEC alleges is a fraudulent scheme to evade the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"). The SEC alleges that the defendants engaged in a comprehensive, years-long scheme to defraud investors and evade securities laws by selling restricted shares of Hemp, Inc. ("Hemp") stock without registering the sales. The SEC claims the defendants sold hundreds of millions of unregistered and purportedly

unrestricted shares of Hemp to public investors.  To accomplish this scheme, the defendants exchanged gifts and entered into consulting agreements that the SEC does not believe were bona fide.  The SEC alleges that defendant Barry K. Epling ("Epling"), through his two entities Ferris Holding, Inc. ("Ferris") and Hobbes Equities, Inc. ("Hobbes") (jointly, the Epling defendants") sold $9 million dollars in securities, of which $1.8 million was used to pay expenses on behalf of defendant Bruce J. Perlowin ("Perlowin") and Hemp.  The defendants claim these payments were personal loans from Epling's entity, Ferris to Perlowin.

## II.   THE SEC'S MOTIONS FOR SANCTIONS (ECF NOS. 92, 97)

The SEC's first motion for sanctions was filed against Epling for his asserted violation of discovery obligations.  Pursuant to Rule 34 of the Federal Rules of Civil Procedure,[1] the SEC served a discovery request on Epling asking for copies of his filed tax returns for tax years 2011–2016, including all schedules and related tax forms.  The SEC asserts these tax returns are relevant to whether the consulting agreements between Epling, individually or through Ferris and Hobbes and other defendants were in fact bona fide.  Epling failed to produce responsive documents and reportedly misled the SEC about the existence of his tax returns over the course of many months. Epling finally produced tax documents that were unsigned and undated computer printouts of his tax returns with the watermark "DO NOT FILE."  The SEC attempted to obtain copies of the filed tax returns directly from the IRS and learned that all four years of his personal returns were filed on the same day—May 5, 2017, nearly three months after the SEC made its discovery request, and after Epling told the SEC through his counsel he had just "located" the tax returns.  The SEC argues that it is now apparent that the tax returns did not exist and were created by Epling in response to the SEC's discovery request.

The SEC requests that the court impose discovery sanctions by excluding what the SEC characterizes as falsified evidence.  The SEC also asks the court to impose an adverse inference and adverse jury instruction that the consulting agreements between Epling, either individually or through his companies Ferris and Hobbes, and other defendants in this case were not bona fide.

The motion also argues that sanctions are appropriate against Epling and Perlowin because

---

[1]  All references to a "Rule" or the "Rules" in this Order refer to the Federal Rules of Civil Procedure.

of their deposition testimony in this case.  They both testified that there were no documents memorializing the $1.8 million loan agreement from Epling, Ferris, or Hobbes to Perlowin or Hemp.  However, several weeks after their depositions, Epling and Perlowin produced copies of documents they claim memorialize loans in direct contradiction to their earlier testimony under oath.  The SEC asks the court to sanction Epling and Perlowin by excluding all evidence related to the claimed loans and impose an adverse inference and adverse jury instruction that there were no loans.

The SEC's second Motion for Sanctions (ECF No. 97) was filed less than a week later. The SEC received evidence from the IRS confirming its belief that Ferris had fabricated evidence. The second motion reiterates arguments made in the first motion, but supplements the motion based on information received directly from the IRS after the first motion was filed.  Specifically, the SEC served a Rule 34 discovery requests on all three defendants for copies of their filed federal tax returns for tax years 2011 to 2016, including all schedules and related tax forms.  Tax returns were sought as discovery relevant to whether defendants claim that the payments made to them under consulting agreements as compensation were, in fact, bona fide.  Ferris failed to produce responsive documents and misled the SEC about the existence of the tax returns, but finally produced responsive documents that were unsigned and undated computer printouts of tax returns with the watermark "DO NOT FILE."  Ferris produced additional copies of what it claimed were "as-filed" tax returns for the years 2011 through 2015.  However, none of these tax returns were signed or dated.  The SEC therefore made further efforts to obtain Ferris' filed tax returns directly from the IRS and learned that three of the tax returns that Ferris represented in discovery responses were copies of the "as-filed" tax returns were not filed with the IRS.  One of the tax returns that Ferris filed with the IRS does not match the data the SEC received from the IRS for that tax return. The SEC claims it is apparent that Ferris fabricated the tax returns in response to the SEC's discovery requests and misled the SEC about both their existence and their filed status.

As a result of this discovery misconduct by Epling through his company, Ferris, the SEC requested that the court impose terminating sanctions against Epling and the two corporate defendants he controls, Ferris and Hobbes.

### III.     THE DEFENDANTS' RESPONSES (ECF NOS. 108, 109)

Defendants Epling and Perlowin filed a Response (ECF No. 109) to the first motion for sanctions arguing that the SEC motion was an attempt to gain an unfair litigation advantage and "create a side-show about tangential and contested facts" rather than resolving this case on the merits.   The response argues that the SEC's motion is based on false allegations, unreasonable inferences, disputed facts, and a misunderstanding of important facts relevant to the testimony. Counsel for Epling and Perlowin offered counsel for SEC the opportunity to take additional depositions of Epling and Perlowin and their accountant, Michael Moore ("Moore"), to explore facts relating to the connection between their previous testimony and the subsequent production of documents after their deposition.  However, the SEC rejected these efforts and instead filed its motion for sanctions. The SEC did not file a motion to compel before seeking sanctions, and the defendants have therefore not violated any discovery order entered in this case.  The defendants argue the SEC's motion raises credibility issues on disputed issues arising from the testimony of these defendants that cannot be resolved by a sanctions motion.  The response also contends that the requests for relief the SEC seeks is extreme and excessive under both Rule 37 and the court's inherent authority.

The defendants do not contest the history of discovery sent or the communications between counsel or the deposition testimony related in the SEC's motion.  However, defendants do contest the inferences and conclusions made by the SEC.  Defendants maintain that after their depositions were taken they found documents and complied with their duty to supplement under Rule 26(e). The response argues that Perlowin and Epling were testifying in their individual capacities and not as a Rule 30(b)(6) representative of their respective companies.  Therefore, they were under no obligation to educate themselves about particular documents related to the case, only to testify truthfully to the best of their recollection.

Messrs. Epling and Perlowin dispute that they provided false testimony at their deposition. At his deposition, Epling testified "no" to the question of whether there was a "written loan agreement," but later testified there was an agreement in December that stated what the loan was for, what the interest was, and that he paid it in full.  Epling also testified at his deposition that "as

with all other loans that I have given Bruce since 1992, there was nothing memorializing it" before December 2015. Perlowin's declaration was submitted in support of the response and avers that he is not a "document person generally, and especially when it comes to any arrangement with his long-time friend Epling." Perlowin acknowledges that he signed the loan document he testified at his deposition did not exist. However, the response states that "while a document signed by Perlowin may contradict what he had 'seen' because if he signed it, he probably 'saw' it. It does not contradict his testimony as to what he was 'aware of'."

The SEC may challenge Perlowin's testimony at trial about the existence of the document and whether his recall at deposition was truthful. However, the court may not make such a credibility finding or impose exclusionary sanctions or negative inferences in ruling on a motion for sanctions. Perlowin is not one who would be expected to recall documents or the execution of documents, and the SEC is not entitled to distort the defendants' testimony to gain unfair litigation advantage through motion practice.

The Epling defendants filed a separate response (ECF No. 108) to the SEC's second motion for sanctions. The response largely reiterates arguments made in response to the first motion. It argues the SEC's request for terminating sanctions is an extreme, wholly inappropriate request and an attempt to gain litigation advantage based on heavily disputed facts. The response also reiterates that the defendants to not contest the history of the discovery sent or communications between counsel or deposition testimony as related in the SEC's motion. The response concedes that federal courts have the inherent authority to impose terminating sanctions like dismissal because of abusive litigation practices during discovery when there is a pattern of deception of discovery abuse making it impossible for the court to conduct a trial with any reasonable assurance that the truth will be available. However, termination is a harsh sanction, and dismissal is warranted only when a party has deliberately engaged in deceptive practices that undermine the integrity of the judicial proceedings. The most critical factor for the court to consider in assessing whether case dispositive sanctions are appropriate is whether the discovery violations threaten to interfere with the rightful decision of the case. The Ninth Circuit applies a five-part test to determine whether terminating sanctions are warranted.

The response also concedes that the SEC correctly cited the caselaw in the Ninth Circuit regarding the court's authority to impose sanctions for fabrication of evidence or for discovery abuses. However, the defendants claim the cited cases are distinguishable and present circumstances with undisputed or reasonably undisputable findings of concealment and lying or other abusive discovery. Terminating sanctions are reserved for only the most egregious cases. The declarations supporting the defendants' responses show that the facts on which the SEC bases its allegation of false testimony do not "raise to the same standard as" the cases cited by the SEC authorizing terminating sanctions. The SEC's allegation that Mr. Epling furnished intentionally false testimony is squarely contradicted by Mr. Moore's declaration. However, even if Moore were wrong or mistaken, there is no evidence that the Epling parties participated in any fabrication.

The response disputes that Ferris and Epling fabricated evidence after receiving the SEC's discovery requests for Ferris' tax returns. Mr. Moore's declaration makes clear that this allegation is completely false. Mr. Epling's declaration avers that he relied on Moore to prepare the returns for Ferris and for his personal tax returns and Epling believed they were prepared. Epling requested that Mr. Moore provide the returns to his counsel for production to the SEC, and Moore attests in his declaration that he did so. The declarations of Epling and Moore are the only evidence of Epling's state of knowledge and intent regarding the tax forms and clarify that, at worst, any inaccuracies regarding the filing status of the tax returns at issue were not intentional but based on an honest misunderstanding between Epling and Moore.

The Epling defendants, through their counsel, continued to cooperate and make best efforts to mitigate any alleged prejudice to the SEC. Counsel for the defendants responded to the SEC's October 27, 2017 letter by assuring the SEC that counsel had endeavored to provide complete and accurate information to all parties including the SEC and the court. Counsel assured the SEC that he would not and did not knowingly communicate inaccurate information and that he was committed to working with the SEC to facilitate a plan to get the information requested directly from the source. Counsel for the defendants also agreed to make Epling and Moore available for further inquiry at a second deposition. The SEC rejected this offer and immediately filed a motion for terminating sanctions that is highly duplicative of the earlier sanction motion.

The Epling defendants maintain the SEC's unilateral determination that the defendants gave incomplete and misleading responses to discovery requests is not the standard for terminating sanctions. There is no evidence that the defendants fabricated the tax returns based on the timing of the filing of the returns because this is "completely disproved by the Epling and Moore declarations." The SEC's allegations that Ferris produced incomplete and misleading documents to hide the fact that it never filed the tax returns is supported only by an IRS report for which there is no foundation or explanation by a competent witness. At most, there is "some confusion between the parties regarding copies of tax returns produced to the SEC in an effort to cooperate to provide whatever information is desired by the SEC to avoid any prejudice." Epling believed his representations regarding the tax returns to the SEC were truthful and accurate at the time they were made. Mr. Moore avers that he believed his representation that the tax returns were indeed filed was likewise truthful and accurate at the time. This does not amount to evidence of willfulness, fault, or bad faith that would justify terminating sanctions.

The defendants argue that before the court may impose terminating sanctions, there must be a relationship between the misconduct and the matter in controversy severe enough to interfere with the rightful decision of the case. Here, the Epling defendants do not contest the broad potential relevance of the requested documents; however, "they are far from central to the claims at issue here." The declarations submitted with the response provide evidence that Epling relied on his accountant and reasonably believed that the returns had been filed. These declarations are competent evidence that refute a finding of willful, intention fault or bad faith. The court should therefore deny the motion for terminating sanctions.

## IV.   THE SEC'S REPLIES (ECF NOS. 114, 115)

The SEC replies that a motion to compel was not filed because there was nothing to compel the Epling defendants to do. They had already responded to discovery requests by providing fabricated documents on more than one occasion. After months of dilatory and misleading conduct, the SEC conducted three meet-and-confer telephone calls, and two in-person meet-and-confer meetings with counsel in addition to exchanging more than five letters and countless emails. After months of being misled and provided with false information and documents, the SEC was

1    under no obligation to obtain any further information from Epling or his accountant.

2        The replies argue that even after the motions were filed, the Epling defendants seek to

3    withhold the truth from SEC and the court with respect to the Epling defendants' tax returns.

4    Epling now seeks to place the blame solely on his accountant.  Neither Moore nor Epling have a

5    credible explanation for the repeated production of unsigned and undated tax returns, the failure

6    to produce the belatedly-filed personal tax returns.  Epling twice produced what was claimed to be

7    "as filed" tax returns for Ferris that were not filed with the IRS.  Terminating sanctions are

8    appropriate where, as here, the Epling defendants have repeatedly concealed the truth and caused

9    prejudice to the SEC as a result of their misconduct.  Because of Epling's repeated deceptive

10   conduct, "the Commission and the Court are left with doubt as to the veracity of all of the Epling

11   defendants' statements and documents produced throughout the course of this litigation."  Epling

12   cannot explain away his asserted beliefs about the as-filed status of his personal tax returns and

13   Ferris' tax returns.  Rather, the Epling defendants' responses to the SEC's two motions for

14   sanctions demonstrate the steps that the defendants will go to in order to conceal the truth.  The

15   court should therefore impose terminating sanctions.

16   **V.    THE ARGUMENTS MADE AT THE FEBRUARY 1, 2018 HEARING**

17       The SEC seeks case-terminating sanctions against four defendants—individual defendants

18   Epling and Perlowin, and Mr. Epling's two corporate entities, Ferris and Hobbes.  The SEC

19   claimed these defendants have engaged in abusive litigation practices that threaten to interfere with

20   the rightful decision of the case on its merits.  The SEC contended that these defendants provided

21   false and misleading responses to discovery and fabricated documents and that Epling provided

22   false testimony at his depositions.  Specifically, the SEC claimed that: (1) Perlowin falsely testified

23   at his deposition that there were no documents memorializing the purported $1.8 million dollar

24   loan agreement; (2) Epling falsely testified at his deposition there were no loan documents

25   memorializing the purported $1.8 million dollar loan agreement; (3) the loan documents produced

26   after the depositions of Messrs. Perlowin and Epling were not timely disclosed and should be

27   excluded under Rule 37(c)(1) unless the defendants meet their burden of showing the failure to

28   timely produce was substantially justified or harmless; (4) Epling misrepresented and falsely

claimed that he filed personal income tax returns for the years 2011 through 2016 in discovery; however, information obtained directly from the IRS indicate that these returns were not filed until May 7, 2017, long after the IRS served its request for production of documents; and (5) the 2013 tax return for Ferris provided to the SEC in discovery does not match the information that was obtained directly from the IRS.

During oral argument, counsel for the SEC argued that the significance of the false and misleading tax returns Ferris provided to the SEC is that Ferris claimed significant receipts and income on the tax return that were not reflected in the tax return filed with the IRS.  The government received Ferris' tax return transcript for the tax year 2013.  The transcript contains all zeros.  Counsel for the SEC argued "the information on the tax return would go to the issue of whether or not those compensation agreements and that payment of stock was in fact bona fide." Feb. 1, 2018 Hr'g Tr. (ECF No. 118) at 11:2–4.  The compensation agreements include the stock transferred as part of the consulting agreement, which the SEC claims the defendants were attempting to use as an exemption from Section 5's registration requirements.  *Id.* at 11:11–17.

The SEC argued that the defendants fabricated the tax returns and prepared them after they engaged in the securities transactions to provide a post hoc rationalization for the legitimacy of the transactions.  *Id.* at 11:21–25.  The SEC maintained the same was true with respect to the tax returns that were not filed with the IRS until after the SEC served its request for production in this case.  The fact that the defendants did not timely file any tax returns with the IRS claiming any compensation tends to show that the compensation agreement and transfer of stock to repay $1.8 million dollars in a series of loans were not bona fide transactions.  Rather, they were transactions to avoid the registration requirements of the Securities Act.

During discovery, the defendants presented the SEC with copies of what they claimed were as-filed tax returns showing what was claimed for compensation on their tax returns.  However, the SEC learned directly from the IRS that the defendants did not claim that they had paid any compensation in returns filed with the IRS.  Additionally, the defendants represented to counsel for the SEC that they had filed tax returns when in fact they had not.  Four tax returns for were filed on May 7, 2017 after the SEC served written discovery requests on the defendants for the

returns. Although defendants executed multiple signed IRS consent forms to allow the SEC to get tax return information directly from the IRS, the SEC argued the defendants engaged in intentional misconduct. Counsel for the SEC argued that the defendants' cooperation in executing consent forms was done because failing to do so would have resulted in a motion to compel, and the fact that the consent forms were executed did not outweigh the multiple misrepresentations the defendants made throughout the discovery process.

Tax returns were filed with the IRS on May 2 and 5, 2017. However, counsel for the SEC was told that the defendants had finally located the as-filed tax returns and would be providing a copy to the SEC shortly. The representation that the documents had just been located was false because they could not have been located if they did not yet exist. On May 2, 2017, when the representation was made, there were no tax returns to have been located. On May 12, 2017, when the defendants produced the documents ten days later, they were not signed or dated and the SEC received computer printouts with the "DO NOT FILE" watermark on them. At the time of the initial hearing, the SEC still had no explanation for why the "DO NOT FILE" copies were provided to the SEC in discovery without a date or a signature.

The same misrepresentations were made with respect to Mr. Epling's personal tax return. He is the sole person in control of both Ferris and Hobbes who reported their income as a corporate entity through Ferris. The SEC received the personal income tax returns for Epling from the IRS that were signed and dated in May 2017. The SEC immediately raised its concern with counsel for the defendants. The SEC is requesting case-terminating sanctions because of the length to which it went to obtain information in discovery and the series of false and misleading representations about the personal and corporate tax returns throughout the discovery process. Given the numbers of times that the concerns about the documents were raised with opposing counsel and the disparity in the information provided in discovery from that received from the IRS, the SEC determined that case-terminating sanctions were appropriate.

Additionally, the initial motion for sanctions was based on false testimony provided by Epling and Perlowin at their depositions with respect to loan documents subsequently produced after their deposition. Mr. Epling testified at his deposition that there was nothing in writing that

memorialized the agreements about the series of loans made by Perlowin to Epling beginning in 1992. However, after his deposition was concluded, the SEC was provided with a document that was a promissory note listing payments and an interest amount signed by Mr. Perlowin. Two other documents were subsequently produced. First was a December 2015 document that purported to memorialize in writing a verbal agreement made between Epling and Perlowin in 2012. This is a four-page single-spaced document signed by both Perlowin and Epling. The defendants also produced documents purporting to evidence payment of more than $2 million dollars that occurred in January 2017, only 60 days prior to Epling and Perlowin's depositions. Mr. Epling unequivocally testified at his deposition approximately 60 days before these documents were produced that there were no documents memorializing these loans and nothing in writing.

At his deposition, Mr. Perlowin testified "no" and "none" without reservation to the questions that were asked about whether there were any documents memorializing the loan transactions between Epling and Perlowin. However, two months after his deposition, his explanation for why he had not produced documents that he signed was that he could sign things but might not have seen them or been "aware of" them even if he signed them. The individual defendants' deposition testimony coupled with the false representations about the tax returns warrant terminating sanctions against Epling. With respect to Perlowin, the SEC did not seek terminating sanctions, but asked for an adverse inference instruction and exclusion of the documents produced after the deposition purporting to memorialize the loan agreement.

Separate counsel for the defendants, Thomas Littler, was retained to answer the sanctions motions because of the nature of the allegations made. Specifically, counsel involved with communicating the defendants' discovery responses and explanations made representations based on what the defendants told him and felt he had a conflict with arguing the motions. The SEC's moving papers did not claim that Mr. Sporkin or his firm, Buckley Sandler, LLP, did anything wrong. Rather, the SEC claimed it was the defendants who misrepresented and deceived their counsel. Mr. Littler defended the motions for sanctions asserting that defense counsel from Buckley Sandler took their discovery responsibilities very seriously and attempted to address the issues resulting in the SEC's motions for sanctions. He was brought in because Buckley Sandler

1    was a participant in doing things incorrectly and it was determined that separate counsel should

2    argue the matter.  Mr. Littler argued these discovery responses and productions were the result of

3    misunderstanding between the clients and the accountant, Mr. Moore.  He characterized the

4    problem with the document production and testimony of the two defendants as a result of "the

5    fragility of the human recollection."  Hr'g Tr. (ECF No. 118) at 23:6–8.  Mr. Littler also argued

6    that the tax transcript showing zeros was not necessarily inconsistent with the 2013 Ferris tax

7    return.  Mr. Littler understood that in certain circumstances if a taxpayer does not file a return, the

8    IRS will file its own return, and that he believed that was what the 2013 transcript represented.

9         After hearing oral argument, the court granted the SEC's motions for sanctions but

10    continued the matter for an evidentiary hearing to obtain sworn testimony from Messrs. Epling,

11    Perlowin, and Moore.  *See* Feb. 1, 2018 Mins. of Proceedings (ECF No. 116).  The court indicated

12    that a decision concerning the extent of the sanctions would be reserved until after the testimony

13    was taken.  Specifically, the court indicated testimony would be taken to make credibility

14    determinations before deciding the severity of the sanctions warranted.

15    **VI.   THE MAY 16, 2018 EVIDENTIARY HEARING**

16         **A.  Testimony of Bruce J. Perlowin**

17         Mr. Perlowin testified he has been the CEO of Hemp, Inc. since 2009.  May 10, 2018 Evid.

18    Hr'g Tr. (ECF No. 135) at 9:21–25.  He was charged and convicted of felony offenses related to

19    marijuana smuggling, continued criminal enterprise, racketeering and smuggling and perhaps

20    interstate transportation of marijuana.  *Id.* at 10:10–23.  He pled guilty and received a 15-year

21    sentence of which he served nine years.  *Id.* at 11:11–17.

22         He first met Barry Epling when he was running a company called GlobalCom 2000.  *Id.* at

23    11:22–23.  This was in the early-1990s or late-1980s.  *Id.* at 12:6–7.  Epling has loaned Perlowin

24    money in various business enterprises in addition to Hemp and GlobalCom.  *Id.* at 12:17–22.

25    Epling loaned Perlowin nearly $2 million in connection with Hemp.  *Id.* at 14:4–8.  Epling loaned

26    smaller amounts to Perlowin and his entities before Hemp.  *Id.* at 14:10–13.  Epling loaned

27    Perlowin $1.8 million dollars in a series of little loans over a four-year period. *Id.* at 14:18–24.  In

28    loan transactions prior to Hemp, Perlowin could not recall any written loan agreement.  *Id.* at

15:19–22.  In the loans prior to Hemp "it would have been like getting a loan from your brother. You don't document it.  Or I don't."  *Id.* at 16:9–10.  Perlowin did not specifically recall whether there were any pre-Hemp loans, but testified it was likely because "we had that relationship."  *Id.* at 16:16–20.

Mr. Perlowin testified that with respect to the $1.8 million in loans that Epling extended to Perlowin or Hemp, there were no written loan agreements at the time the loans were extended.  *Id.* at 17:2–6.  When asked about whether any terms were negotiated, Perlowin testified "I'm sure something was said.  I can't recall anything."  *Id.* at 17:7–10.  Epling and Perlowin had discussions about the "concept" of interest, but Perlowin testified that he did not believe they ever came to an exact amount during the three-or-four-year period.  *Id.* at 17:11–16.  The loans to Hemp began in approximately 2012.  *Id.* at 17:17–19.  They continued until approximately 2015.  *Id.* at 17:20–22.  He estimated there were hundreds of loans during this timeframe.  *Id.* at 18:2–9.  Nothing was done in cash; everything was checks.  *Id.* at 18:10.  Ninety percent of the time Epling paid a bill for Hemp.  *Id.* at 18:14–16.  A dozen people could have asked Epling to pay one of Hemp's bills.  *Id.* at 19:11–16.  This was a "fairly informal" process.  *Id.* at 20:3–13.  Perlowin did not document the payments at the time of each loan.  *Id.* at 20:17–20.

Counsel for SEC provided Mr. Perlowin with a copy of the declaration he prepared in response to the SEC's motion for sanctions..  *Id.* at 22:4–9; Resp. Ex. 1 (ECF No. 109) at 18–22, Perlowin Decl.  Counsel for Perlowin drafted the declaration.  Evid. Hr'g Tr. (ECF No. 135) at 23:5–7.  The declaration was dated December 4, 2017, and contains an electronic signature, but Perlowin did not recall whether he signed the document or authorized counsel to do so on his behalf.  *Id.* at 23:10–17.

Mr. Perlowin was deposed twice in this case.  *Id.* at 24:2–4.  It is his position that he testified truthfully at those depositions.  *Id.* at 24:16–19.  He made a mistake, told his counsel he made a mistake "in this one thing and they told you guys.  And I forget exactly what it was."  *Id.* at 24:20–25.  At no point did he intentionally mislead the SEC.  *Id.* at 25:3–5.  At his deposition, he was asked whether there was any documentation of the loans amounting to approximately $1.8 million.  *Id.* at 25:9–18.  The first deposition was taken March 3, 2017, and the second on April 27,

1   2017. *Id.* at 25:23–25.

2        After being shown a copy of the transcript of the March 2017 deposition, Perlowin recalled

3   testifying that he had seen a list of payments made by Epling on a computer. *Id.* at 26:5–19. Epling

4   created the list. *Id.* at 26:25–27:1. Perlowin was asked by counsel for the SEC at his deposition

5   what written documents he had seen other than what was on Epling's computer screen and testified

6   "none". *Id.* at 27:4–14. He is aware that after his March deposition, his counsel produced

7   documents relating to the loans to the SEC on April 5, 2017. *Id.* at 27:15–18. These documents

8   contained a series of instructions to brokers and transfer agents regarding shares that would be

9   converted and transferred to Epling from Perlowin or Hemp. *Id.* at 27:19–23. The documents also

10  included a summary of the payments that Epling made on Perlowin's behalf that constituted loans.

11  *Id.* at 27:24–28:2.

12       The documents that defense counsel produced on April 5th were provided to Mr. Perlowin.

13  *Id.* at 28:13–21 (citing ECF No. 92-18). The last page is a Promissory Note Worksheet dated

14  June 1, 2016. *Id.* at 28:20–21. When asked whether he recognized these documents as those that

15  were produced by defense counsel to the SEC on April 5, 2017, he responded "not really." *Id.* at

16  28:22–29:4. He testified his attorneys produced a ton of documents, which Perlowin had glanced

17  through; however, he is "not really a detail person when it comes to paperwork." *Id.* at 29:4–7.

18  He does not dispute that these documents were produced on April 5th; he just did not recall. *Id.*

19  at 29:11–13. He believes these are the documents referred to in paragraph 10 of his declaration.

20  *Id.* at 29:14–30:13. On the witness stand at the hearing is the first time he had "looked at this in

21  this much detail. I just don't look at the documents. I don't have time. There's too many of 'em."

22  *Id.* at 30:14–20.

23       The exhibit, ECF No. 92-18, contains a letter dated December 30, 2016, from Kim Brady

24  to Madison Stock Transfer. *Id.* at 31:2–8. He did not recognize the specific document but

25  recognized the format. *Id.* at 31:9–10. Ms. Brady does "all of the stock" for both of Perlowin's

26  companies, the first public company that Perlowin had and the current one. *Id.* at 31:11–14.

27  Perlowin was familiar with her signature and testified it was her signature on the document. *Id.* at

28  31:18–32:14. The document is an instruction Ms. Brady sent out regarding the transfer of Hemp

funds to Mr. Epling. *Id.* at 32:15–19. Perlowin did not know the background of the document but could "guess as to how this came about." *Id.* at 31:19–23. The document says "combine 100,000,000 shares and 8.9 million shares," which are the documents by which Perlowin and Hemp repaid Epling over $1.8 million dollars to repay his loans. *Id.* at 33:2–11.

The last page of the document, page 15 of 15, is a Promissory Note Work Sheet dated June 1, 2016. *Id.* at 33:14–18. It contains a summary of loans that Epling extended to Perlowin or on behalf of Hemp totaling $1.853 million dollars. *Id.* at 33:19–25. Perlowin testified he had no knowledge of this document at the time of his March 2017 deposition. *Id.* at 24:3–6. Perlowin was "not really" aware that he had repaid Epling over $1.8 million dollars in December of 2016 and January of 2017. *Id.* at 34:11–13. Perlowin was asked how it was possible that he was not aware that he was repaying Epling almost $2 million. *Id.* at 34:17–18. He responded "[w]ell, what you said was impossible to happen. Kim does not transfer any stock, ever, without asking me first." *Id.* at 34:19–20. This is one out of three or four hundred transactions and Perlowin testified there was no way he could "pick his memory" to recall just one of them. *Id.* at 35:5–7.

Perlowin paid Epling over $2 million dollars approximately 60 days before his March 2017 deposition. *Id.* at 35:15–21. However, at the time of his March 2017 deposition, he had no recollection or knowledge of this transaction. *Id.* at 35:22–24. Perlowin's declaration states "I did not have possession or control of those documents and knew nothing of their existence at the time of my deposition." *Id.* at 35:25–36:5. He reiterated in his testimony at the evidentiary hearing that he knew nothing of the existence of these documents at the time of his deposition. *Id.* at 36:6–8.

Page 6 of 15 is a document titled "Issuance Resolution." *Id.* at 36:11–18 (citing (ECF No. 92-18)). Ms. Brady would have filled out this document. *Id.* at 36:22–24. Perlowin signed it. *Id.* at 37:4–11. He has authorized Ms. Brady to sign on his behalf. *Id.* at 37:15–17. Perlowin would verbally give her permission over the phone to sign his name. *Id.* at 37:25–38:1. However, the signature on the Issuance Resolution is clearly Perlowin's signature and not Brady's. *Id.* at 38:2–7.

Mr. Perlowin was deposed a second time on April 27, 2017. *Id.* at 38:15–20. At that deposition, he was again asked about documentation of loans between Epling, himself and Hemp.

*Id.* at 38:21–24.  Perlowin was again shown a copy of his declaration submitted in response to the SEC's motion for sanctions.  Paragraph 11 of the declaration states that during his continued deposition in April 2017, he was asked whether there are any documents that Perlowin had with respect to the transactions that are contained in the promissory note.  *Id.* at 39:4–16.  In paragraph 11 of Perlowin's declaration he averred "not that I am aware of."  *Id.* at 39:17–20.  His answers at deposition were honest testimony.  *Id.* at 40:11–16.  It was Perlowin's testimony at his deposition, his testimony in his declaration, and his testimony at the evidentiary hearing that he had no knowledge of these loan documents at the time of his depositions.  *Id.* at 40:17–24.

Mr. Perlowin was shown ECF No. 92-20, a May 12, 2017 letter from defense counsel to the SEC conveying a series of documents attached to the letter.  *Id.* at 41:14–19.  The first page is a promissory note dated December 15, 2015, page 4 of 9.  *Id.* at 41:19–22.  On page 7 of 9, his signature appears as well as a signature purporting to be of Ferris.  *Id.* at 41:23–42:1.  The next page, 8 of 9, is a document entitled "PAYMENT IN FULL OF ALL LOANS AND INTEREST TO FERRIS HOLDING, INC., BY BRUCE PERLOWIN" dated January 5, 2017.  *Id.* at 42:2–6.  Mr. Perlowin's signature is on the document.  *Id.* at 42:9–10.  The last page of the document is the Promissory Note Work Sheet dated June 1, 2016.  *Id.* at 42:11–14.  He recognized page 9 of 9 but did not recognize the other documents.  *Id.* at 42:15–18.  He has signed so many documents; his policy is he would sometimes glance through it and sometimes not; he never read it in detail; he just did not have the time to do so and just signed it.  If Epling "says it's good, it's good."  *Id.* at 42:19–25.  The documents marked ECF No. 92-20 are the same documents he referred to in his declaration.  *Id.* at 43:16–20.  However, paragraph 13 of the declaration says that he was unaware of the existence of these documents at the time of his deposition testimony or thereafter.  *Id.* at 43:21–44:5.

It remains Mr. Perlowin's position that at the time of his two depositions, when he provided his declaration in December 2017, and during the evidentiary hearing, he did not have any knowledge regarding the existence of these specific loan documents between himself and Mr. Epling.  *Id.* at 44:13–21.  He had no record of the documents and had no copies in his possession or control that he could find.  *Id.* at 44:22–24.

1    Mr. Perlowin was then asked whether he recalled signing the documents.  *Id.* at 44:25. He

2    responded "[n]ow, I do, after we've gone over it.  At the time, I didn't.  But now—and I even

3    remember where I was standing when we signed it.  But we've gone over, my—my—my counsel,

4    since that time.  And so, sitting here today I do remember this."  *Id.* at 45:1–5.  During the

5    evidentiary hearing, he now recalled that he signed the documents at Epling's house while sitting

6    in the living room going over a bunch of stuff.  *Id.* at 45:8–11.  Epling forced Perlowin to go over

7    the documents, and Perlowin would, and then it would go in and out of his head.  *Id.* at 45:10–14.

8    There were "way more important things that we were doing and way bigger deals than me focusing

9    on this deal.  And, since I trusted him explicitly, I don't need to go over his work in detail."  *Id.* at

10   45:14–17.

11   Mr. Perlowin then testified he recalled these details "sometime within the last six months

12   maybe."  *Id.* at 45:18–20.  When asked whether he recalled prior to providing his declaration, he

13   initially testified "no" and then "maybe" and then he "didn't remember".  *Id.* at 45:21–23.  It was

14   during "his last couple of conversations with Barry and my – or Barry.  I did not know who it was.

15   And then I said, 'Oh, I remember when I signed that'."  *Id.* at 46:9–12.  Perlowin wanted to change

16   his declaration testimony now that he has a recollection of signing these documents.  *Id.* at 46:13–

17   16.  He testified he wanted to "be real clear—I'm talkin' within the last 60, maybe 90 days, maybe

18   last 30 days.  It was a recent memory—you know, you can only talk about somethin' so much

19   before it finally—you remember."  *Id.* at 45:18–21.  On the date of the evidentiary hearing, he now

20   recalls signing the last page of the Promissory Note Work Sheet, dated June 1, 2016, at Mr.

21   Epling's house.  *Id.* at 46:24–47:6 (citing (ECF No. 92-20) at 9).

22   On cross-examination by his own counsel, Mr. Perlowin testified he did not recall meeting

23   with counsel and having counsel interview him before his declaration was prepared.  *Id.* at 48:9–

24   11.  "I don't remember meeting you and I don't remember not meeting you."  *Id.* at 48:14–15.  The

25   declaration was true and correct as of December 4, 2017.  *Id.* at 49:2–6.  His recent recollection he

26   had just given at the evidentiary hearing was refreshed from a couple of guys sitting around and

27   "stimulating each other's memory back and forth."  *Id.* at 49:9–19.

28   Paragraph 5 of his declaration states that he is not the type of person who generally requires

17

documentation for an agreement or business deal. *Id.* at 50:6–13; Resp. Ex. 1 (ECF No. 109) at 18–22, Perlowin Decl. When asked to explain, he responded "I don't know if you're going to like this one, but…" Evid. Hr'g Tr. (ECF No. 135) at 50:17. He went on to explain that when he was young 30 or 40 years ago, he was a smuggler and didn't tell the guy who was offloading his boat to "make a document": "That's not what you do. Your word is your bond. You live or die by your word back in those days." *Id.* at 50:18–24. He was a non-violent marijuana smuggler. *Id.* at 50:25. His first deal with Epling was a 36-page "friggin' contract." *Id.* at 51:3–14. Epling loves that kind of stuff. Perlowin does not. Perlowin's word is incredibly valuable and important to him because of how he grew up. Perlowin testified "you gave your word and your word was your— your bond. It's, you know, an outlaw code. Whatever. Pirate code. We thought we were pirates in those days." *Id.* at 51:18–25.

Now Perlowin runs a public company and is required "to have contracts and everything." *Id.* at 52:13–16. Hemp was the first pot stock in America and you have "to contract and document everything." *Id.* at 52:16–20. That's where Epling comes in. He loves this stuff. *Id.* at 52:21– 22. The first couple of years Perlowin read all of the contracts and is actually pretty good at it. *Id.* at 52:23–24. However, his focus is not in the contracts. *Id.* at 52:25–53:2. In the beginning he wanted the contracts to be fair for both sides. *Id.* at 53:3–4. He is a long-term player and after about two years, Epling would not make them all one-sided in favor of Perlowin. *Id.* at 53:9–12. After the first couple of years, Perlowin did not have to go line by line anymore because Epling knew he operated from the heart and Perlowin would just sign it. *Id.* at 52:12–16. Most of the time when Perlowin gets a document from Barry he signs it about 90% of the time. *Id.* at 53:22– 25.

Perlowin did not ordinarily keep documents of his transactions with Epling. *Id.* at 54:6–9. He was trying to change that and get more organized because Barry keeps documents or Kim Brady keeps them. *Id.* at 54:10–13. Perlowin relies on others to keep documents relating to his business and personal transactions. *Id.* at 54:17–19.

Perlowin testified he was 57 and his memory was intact. His memory was not as intact as it was in his younger days, but "it's better than most people my age. I have a pretty good memory,

but it's nowhere as near where it used to be." *Id.* at 56:13–20.

At the time of his April 27, 2017 deposition, he was not aware of the documents in Exhibit 92-20 that his counsel produced to the SEC on May 12th. *Id.* at 58:14–59:6. Perlowin did not recall the existence of any particular documents because that wasn't his job. "My job was to be the visionary and run the direction of the company, which I've done extremely successfully. And I wouldn't be able to if I was bogged down in documentation all the time." *Id.* at 60:25–61:8. He leaves those kinds of details to others. *Id.* at 61:9–10.

On redirect, Perlowin testified that he could not say for sure but believed the documents relating to the transfer from Perlowin to Epling in January 2017 were kept by Ms. Brady as part of her employment with Hemp. *Id.* at 66:2–8. Perlowin told "Kim to go and look –and I told everybody in my company, go and look and, anything that had to do with this in your computers, any emails, any to comply with all these find it and produce it." *Id*. at 66:9–23. Perlowin testified that he had produced all of the documents pertaining to the allegations involved in this case that were not in Perlowin's personal files or on the computer, but may have been kept and stored in the files of Hemp, Inc. *Id.* at 67:21–25.

The court asked Perlowin what, if anything, he did when he received information from counsel that the SEC was seeking documents and information in his possession or in Hemp's possession to respond to written discovery requests. *Id.* at 68:6–9. Perlowin responded that he sent the document request to everyone that worked for him that had the slightest possibility of having an email, contract or any other documentation to be produced. It went out to everyone and the information was collected and given to the attorneys. *Id.* at 68:10–15. The court asked Perlowin to explain why, if this occurred, documents were produced by his counsel after his deposition that were not originally produced. *Id.* at 69:2–14. Perlowin responded it was an ongoing project. It took six months of working full time more than 40 hours a week to collect the documentation that the SEC wanted. "And that's all one employee for six whole months." *Id.* at 69:15–22. He did not know for sure that these documents were not produced at the beginning. *Id.* at 69:23–25. The court then asked Perlowin to explain how if this amount of effort went into complying with the SEC's document requests the documents were not produced sooner. Perlowin

responded that he gave "the wrong impression" in testifying that all of his employees who might possibly have any documentation spent six months looking for documents. *Id.* at 70:8–15. He was giving an example of how one employee had a six-month ongoing job description; everyone wasn't looking for six months fulltime. *Id.* at 70:16–20. The court asked Perlowan to explain why he and his staff did not find the Promissory Note that was signed by Perlowin until after Perlowin was deposed a second time. *Id.* at 70:23–71:1. Perlowin initially responded he had no explanation, and then said, "[u]nthorough work." *Id.* at 71:2–3.

The court also asked Perlowin who helped him refresh his recollection within the last 30 to 90 days that he really did sign the Promissory Note. *Id.* at 73:7–23. Perlowin responded, "Well, it was myself. I mean, I remember it was in the conversation with either Barry and—and Barry and my [SEC] attorneys." *Id.* at 73:24–74:14. The court inquired whether these conversations occurred between the February 2018 hearing on the SEC's motion for sanctions in which the evidentiary hearing was set, and the date of the evidentiary hearing. *Id.* at 74:15–16. Epling responded, "it was just recently; like, in the last 30–60 days." *Id.* at 74:17–18. He then interrupted the court's question to state, "It had to be in the last couple of weeks because I haven't seen them." *Id.* at 74:19–23.

The court next inquired about his testimony that in the old smuggling days that he didn't have people sign contracts and inquired whether he kept owe sheets. *Id.* at 75:13–21. Perlowin replied, "Pardon?" The court repeated the question and Perlowin asked "What's an owe sheet?" *Id.* at 75:22–25. The court asked whether Perlowin expected the court to believe he smuggled marijuana as a profession, went to prison for it for nine years, and didn't know what an owe -o-w-e- sheet was. Perlowin finally answered: "[o]h, owe. I thought you meant the letter O. Yes, I did keep those records." *Id.* at 75:25–76:4. The court asked why he did that and Perlowin responded "[s]o I know how much people owed me." *Id.* at 76:5–6.

### B. Testimony of Barry K. Epling

Mr. Epling testified that in 1974 he attended two years of junior college taking general education courses. *Id.* at 78:13–21. He currently provides consulting services and has a company that makes nutraceuticals which are the two main sources of his revenue. *Id.* at 78:22–25. He

provides consulting services to companies like Hemp.  *Id.* at 79:1–2.  The name of his business is Ferris Holding.  *Id.* at 79:3–6.  Ferris Holding also produces nutraceuticals, a product that increases circulating stem cells in mammals.  *Id.* at 79:9–13.

He believed he was first involved with Hemp, Inc. in 2010, but was not sure.  *Id.* at 80:1–7.  He currently provides consulting services to Hemp, Inc. and Perlowin.  *Id.* at 80:8–10.  He has provided consulting services periodically to Hemp and continually with Mr. Perlowin.  *Id.* at 80:11–16.  He heard Mr. Perlowin's testimony that he made hundreds of payments to third parties on behalf of Perlowin and Hemp.  *Id.* at 80:17–20.  Mr. Perlowin's testimony was consistent with his own recollection that there were hundreds of payments.  *Id.* at 80:21–23.  A tiny portion of the payments were made directly to Mr. Perlowin, but the vast majority were made to vendors and others.  *Id.* at 81:1–5.  These payments began in approximately 2012.  *Id.* at 81:6–7.  He began paying these obligations on behalf of Hemp because the company needed funding.  *Id.* at 81:8–10.  Epling had been friends with Perlowin for a long time and trusted him, so agreed to loan him money.  *Id.* at 81:10–12.  It was easier to pay vendors directly than providing capital funding to Hemp, and at the time, Perlowin and Epling were sharing an office, so it was an easy way to do it.  *Id.* at 81:13–17.

A tiny amount of these hundreds of payments was for Perlowin's personal matters as opposed to business matters for Hemp.  *Id.* at 81:18–23.  Perlowin asked Epling for help saying he needed money.  *Id.* at 82:2–3.  Epling believed that Perlowin asked him to make payments directly to third parties.  At the time Perlowin could not make the payments.  *Id.* at 82:4–8.  They did not have discussions about this being a loan at the time, "but we do have a history of doing that and we had done that for many years."  *Id.* at 82:9–15.  Epling had previously made payments to Perlowin for business expenses involving the telecom company.  *Id.* at 82:16–25.  Epling loaned Perlowin about $90,000 for the telecom company and was later repaid.  *Id.* at 82:25–83:2.  Epling also loaned Perlowin $20,000 to pay a vendor in a barter company and was later paid back.  *Id.* at 83:3–5.  There were other small loans over time.  *Id.* at 83:6–7.  The loans made on behalf of Hemp were significantly more than the loans Epling had ever made in the past.  *Id.* at 83:11–13.  The payments that Epling made were a personal loan to Bruce Perlowin.  *Id.* at 83:14–17.

Epling gave testimony during the SEC's underlying investigation before this lawsuit was filed. *Id.* at 83:18–20. He was asked about these hundreds of payments made on behalf of Hemp. *Id.* at 83:21–24. He testified that these were loan payments. *Id.* at 83:25–84:2. He did not recall when this testimony was taken. *Id.* at 83:3–5. He did not dispute that he has provided testimony on December 23, 2014, February 9, 2015, and August 18, 2015. *Id.* at 84:6–10. He remembered being deposed in this case in the first part of the year. *Id.* at 84:11–13. He was sworn, testified under oath, and was truthful. *Id.* at 84:14–22. He did not give any testimony intended to mislead the Commission. *Id.* at 84:23–25.

He previously testified that loan payments began in 2012 or 2013. *Id.* at 85:11–20. He previously testified that he did not have a written loan agreement. *Id.* at 85:21–25. That testimony was truthful but would not be truthful if he said it now. *Id.* at 86:1–5. He previously testified that there was an agreement that was settled on in December that stated what the loan was and what the interest was, and that it was paid in full. *Id.* at 86:9–16. Epling has since found out "that it was not the pre—the previous December; it was one year before that, December a year before. 'Cause I believe this was in 2017?" *Id.* at 86:17–20. His deposition was in 2017, and he believed the document was from December 2015, not December 2016. *Id.* at 86:21–23. His prior testimony was wrong. He had the wrong year. *Id.* at 86:24–87:4. Epling was shown the last page of ECF No. 92-18, a Promissory Note Work Sheet dated June 1, 2016. *Id.* at 87:9–14. He does not believe this was the document he was referring to in his prior deposition testimony. *Id.* at 87:15–17. The document before him was a Promissory Note Work Sheet; not a promissory note. *Id.* at 87:18–21.

He was shown ECF No. 92-20, documents produced by defense counsel, on May 12, 2017. *Id.* at 87:22–24. Page 4 of 9 is titled "Promissory Note" and is dated December 15, 2015. *Id.* at 87:24–88:2. This is the promissory note that Epling was referring to in his deposition as "the agreement". *Id.* at 88:3–5. At his deposition, he confused December 2015 with December 2016. *Id.* at 88:6–8.

He was asked at his deposition whether there was any loan agreement and responded no, that there was no agreement; however, what he "stated both times was true as what I was thinking of at the time." *Id.* at 88:9–16.

Mr. Epling was interviewed before by SEC Investigator Thibodeau who sat in the office and had two rings of paper in front of him. Thibodeau would pick up a document, ask what it was and other questions. *Id.* at 88:19–24. Epling told Thibodeau whether or not it was a loan to Perlowin. *Id.* at 88:24–25. He was asked literally hundreds of times whether documents were an undocumented loan and answered that it was an undocumented loan. *Id.* at 89:1–3. To his thinking, these loans were "absolutely undocumented". *Id.* at 89:8–9. However, when counsel for the SEC asked the question about "ever," even though it looks self-serving because it was done so much later, six months after the last loan was given, "it still didn't change the fact that every loan was an undocumented loan. I can't change that and I didn't try to change it with a promissory note. And that's when I realized that I was answering the questions wrong and that's when I changed my position." *Id.* at 89:9–16.

His testimony at the evidentiary is that every loan he gave to Perlowin was, in fact, undocumented until many months after the fact and after the SEC began asking questions about it. *Id.* at 89:17–20.

He testified at his deposition (ECF No. 92-4) that the promissory note agreement of December 2015 was memorialized four years after Epling started loaning Perlowin money. *Id.* at 89:21–90:4. He believed his testimony was truthful then and truthful now; the promissory note memorialized the loan six months after the last loan. *Id.* at 90:5–10. In his mind, all of these loans were undocumented, and in his mind, he had answered the question literally hundreds of times that the loans were all undocumented, and he still thought of them as undocumented. *Id.* at 90:10–13. "I didn't document that for this case; I documented for other reasons." *Id.* at 90:14–15.

The loans may have occurred over three years rather than four years. *Id.* at 91:2–3. What he should have said in his prior testimony was that "well after the last loan and at least six months after the last loan is when we memorialized it. The exact number of years after I started it, I don't know." *Id.* at 91:8–13. However, that was not his prior testimony. *Id.* at 91:14–16. The first line of the promissory note (ECF No. 92-20) reads "On this date of December 15, 2015, to put in writing, confirmation of the verbal agreement made on November 9, 2012." *Id.* at 91:16–23. Four years after 2012 would be 2016. *Id.* at 91:24–25.

He was asked at his deposition (ECF No. 92-14) whether he had produced a copy of the loan agreement and responded that he did not know he was supposed to, apologized, and indicated he would get it to the SEC. *Id.* at 92:1–5.  He understood the SEC was requesting a copy of the loan agreement that he was referring to in his testimony.  *Id.* at 92:6–14.  He testified at his deposition that prior to December 2016, there was never anything in writing that memorialized the loan agreement.  *Id.* at 92:15–20.  He previously testified that as with all other loans that he had given to Perlowin since 1992, there was nothing memorializing it.  *Id.* at 92:21–25.  When asked again whether that was true at the time he testified, Epling responded that he now believes "that there were other documents that I—I just had forgotten."  *Id.* at 93:1–3.  He now believes there are two other documents related to this; he believed his prior statement was a true statement, but at the time of the evidentiary hearing, it was not true.  *Id.* at 93:4–10.

Epling provided a declaration (ECF No. 108) in response to the SEC's motion for sanctions.  *Id.* at 93:17–21.  He signed the declaration under penalty of perjury.  *Id.*  94:4–6.  He did not recall whether he affixed the electronic signature or authorized it but he did approve it.  *Id.* at 94:7–16.  He believed the document to be accurate.  *Id.* at 94:21–22.  He believed, but was not sure, that he was contacted by Tim Coley about providing a declaration.  *Id.* at 94:23–25.  He had no idea of when he was contacted about providing a declaration.  *Id.* at 95:2–7.  He understood the reason he needed to provide a declaration was "to clear up some of the confusion in my testimony." *Id.* at 95:15–17.  He reviewed the motions for sanctions that were filed by the SEC.  *Id.* at 95:18–22.  Drafting of the declaration was a joint effort, but it was his declaration.  *Id.* at 95:23–96:2. He did not believe he spoke with Mr. Perlowin about anything that was included in his declaration. *Id.* at 96:13–15.

Epling initially responded that he did not believe he had spoken to Mr. Moore about what was in the declaration.  *Id.* at 96:19–21.  However, he then testified that he may have spoken with Moore "if this deals with the taxes."  *Id.* at 96:21–97:1.  Now that he realized the taxes were mentioned in the declaration, he answered "yes, I would expect that I would have talked to Mr. Moore because I talk to Mr. Moore about everything related to my taxes and many other things related to my business."  *Id.* at 97:2–6.  He spoke with Mr. Moore as soon as he got the word that

24

one of the tax years had not been filed for one of the businesses. *Id.* at 97:12–23. He first learned this when information was produced by the IRS pursuant to the consent forms that show that the 2013 returns appeared to be all zeros. *Id.* at 97:24–98:6. He did not recall when this was. *Id.* at 98:7–8. Mr. Epling spoke with Mr. Moore to find out what happened. *Id.* at 98:12–23. He had many conversations with Moore over the years and the one thing that he "really stayed on top of was to make sure that my taxes were taken care of. And he always told me that the taxes are filed, everything is fine." *Id.* at 98:23–99:1. Moore always assured him that his taxes were up to date and it was a shock to find out that there was no data in the one year. *Id.* at 99:2–7. Moore was successful in getting Epling a significant "return." He later corrected this testimony stating he meant a refund, not a return. *Id.* at 99:3–15.

Epling's declaration (ECF No. 108) states that he understood that Moore would testify that he filed the Ferris' tax returns. *Id.* at 99:19–23. He believed this was a true statement because he called Moore, asked what happened, and was told that the transcripts were not always accurate. *Id.* at 99:24–100:4. Epling asked Moore how the matter could be fixed, and Moore said he would send Epling the taxes from all of the years. *Id.* at 100:5–10. Epling was very upset when he found out it was not done. *Id.* at 100:11–12. Epling learned in the fall of 2017, when notified by counsel, that the IRS documents reflect that Ferris' tax returns had never been filed for three of the five years. Moore was adamant that the taxes had already been sent in and said he did not know what the problem was. *Id.* at 100:15–22. Moore told Epling that to be on the safe side, Moore was going to fax them in and mail them in. *Id.* at 100:22–24.

The first time that Epling ever signed a Ferris tax return was in 2016. *Id.* at 101:1–4. The tax returns he signed in 2016 were not for the tax year 2016, but for the prior year tax returns that were filed the week before the evidentiary hearing. *Id.* at 101:7–13.

In the fall of 2017, the tax returns were resent which was easy to do because they had already been prepared and Moore said he was sending the exact same tax returns, and nothing had changed in them. *Id.* at 101:14–21. Epling acknowledged that he did not provide the tax returns that were refiled, according to Mr. Moore, in the fall of 2017 to defense counsel or the SEC. *Id.* at 102:13–17.

Epling understood when he was preparing his own declaration that Mr. Moore was also going to prepare a declaration to be submitted to the court. *Id.* at 103:8–11. He understood that Perlowin was also preparing a declaration to submit to the court. *Id.* at 103:12–14. Moore stated he was just going to tell the truth in his declaration; that he provided the returns in a timely fashion, and if there was a problem, the problem was with the IRS. *Id.* at 103:15–20.

Epling was shown ECF No. 92-16, the SEC's fourth request for production of documents. *Id.* at 105:12–16. Epling was sure he had seen this document before because "I've been given all the documents and I have looked at them. So I'm sure I've seen it. But I just don't remember this particular one." *Id.* at 105:20–24. Epling was asked what he did to respond to the request made at his deposition for loan documents and in the request for production. *Id.* at 106:22–23. He responded that he went back and searched for documents; "again, I just had this mental…block because I saw the loans as being undocumented. They were undocumented all through the term. And then for—for months and months afterwards, I kept thinking there'd be documentation for the loan advance. And—and then when we'd have a—when I was in the deposition, I realized I wasn't answering it properly because you said 'ever.' And it finally clicked." *Id.* at 106:24–107:7. This is when he found the three documents; the personal loan between Epling and Perlowin. *Id.* at 107:8–11. He searched first on his computer. *Id.* at 107:14–15. He hadn't looked at the computer before for any agreements "in that time frame" because there were so many things on his computer, he needed a time frame. *Id.* at 107:16–20. Once he had the correct time frame, it took him probably 30 minutes to find the documents. *Id.* at 107:23–24. As soon as he found the documents on his computer, he immediately gave them to his counsel. *Id.* at 108:5–7. He had no idea when he gave the documents to his attorneys. *Id.* at 109:17, 22–23. He had no idea when he sat down to go through his computer for the 30 minutes it took to find the documents. *Id.* at 109:24–110:1.

Exhibit 92-18 is a letter from Epling's counsel, Mr. Coley, dated April 5, 2017, attaching documents. *Id.* at 110:2–5. The last page, page 15, is a document he created June 1, 2016. *Id.* at 110:12–25. The date on the top of the document is correct. *Id.* at 111:1–2. He found the document after his deposition when he realized "that I was answering wrong, because I kept thinking the

1   loans were absolutely undocumented and I realized that that wasn't the question you were asking

2   and that's when I changed my—my testimony in the middle place and it seemed like it didn't make

3   sense." *Id.* at 111:9–17.  Epling did not recognize the other documents that were part of ECF No.

4   92-18 and did not believe he had seen them. *Id.* at 112:5–9.

5          The loans to Perlowin over the course of four years in small payments totaled up on the

6   worksheet to about $1.8 million and Epling added interest to that. *Id.* at 113:1–5.  The total owed

7   was a little over $2 million. *Id.* at 113:6–7.  The entirety of the $2 million dollars was repaid in

8   December 2016 and into January 2017. *Id.* at 113:8–12.  Epling was asked whether the stock that

9   was transferred to him and the value of that stock satisfied the $2 million debt and he responded,

10  "I was satisfied with it." *Id.* at 113:13–15.  Epling did not know whether he gave the Promissory

11  Note Work Sheet and the promissory note from 2015 to defense counsel at the same time. *Id.* at

12  114:20–23.

13         The reason he decided to document the series of loans after the fact was because he had a

14  wife and two daughters and if anything happened to him, they wouldn't know about the million

15  eight. *Id.* at 117:5–14.  The other reason was "if you have stock and want to sell stock at a later

16  date you have to show where you got stock.  And, if you can't show where you got the stock, then

17  you have a problem." *Id.* at 117:15–19.  If he had an undocumented loan, he would not have been

18  able to sell the stock Perlowin transferred to him to pay off the debt. *Id*. at 117:20–24.  This loan

19  was different from other transactions with Perlowin because of the amount. *Id* at 118:14–19.

20  However, in other loan transactions with Perlowin although there was not a loan agreement the

21  amounts owed were written down. *Id.* at 119:3–5.  Epling testified at his deposition that as with

22  every other loan he had with Perlowin there was nothing in writing memorializing it; this was one

23  hundred percent true; nothing was put in writing until 6 months after the last loan was done. *Id.*

24  at 119:6–14.  The date the loan was documented was in December 2015. *Id*. at 120:16–21.  His

25  prior testimony was a mistake. *Id.* at 121: 17–18.

26         A document titled 'PAYMENT IN FULL OF ALL LOANS AND INTEREST TO FERRIS

27  HOLDING, INC BY BRUCE PERLOWIN," page 8 of ECF No 92-20, was signed January 5,

28  2017, two months before his deposition, but he did not recall it at the time "because "this is just a

receipt for payment… and doesn't seem to me to be a loan document.  *Id.* at 122:16–123:15.  Epling prepared the documents and was the only one with a copy; Perlowin didn't want copies.  *Id* at 124:17–24.  The only copy was on Epling's computer.  *Id.* at 124:25–125:3.

Mr. Epling recalled SEC Investigator Thibodeau requesting copies of his tax returns during the investigation.  *Id.* at 127:9–19.  His attorney, Elaine Dowling, agreed to give them to him and stated she would follow up.  *Id.* at 127:20–21.  Epling did not believe he ever provided the tax returns to Thibodeau but didn't remember.  *Id.* at 128:7–10.  An excerpt of a transcript of a proceeding on August 18, 2015 was provided to Epling to refresh his recollection.  *Id.* at 130:12–22.  Epling was asked whether he would be willing, through his attorney, to provide the SEC with federal personal income tax returns for 2011, 2012, 2013, and 2014.  *Id.* at 130:22–25.  Epling answered no.  *Id.* at 131:1. Harold Gewerter was his attorney at the time.  This was one of the reasons Epling got rid of him.  *Id.* at 131:2–4.  Epling did not believe he produced any tax returns to the SEC before this lawsuit was filed in June 2016.  *Id.* at 132:20–22.  Epling recalled seeing a request for production of documents requesting copies of filed personal federal income tax returns and those for Ferris and Hobbes for the years 2011 through 2016.  *Id.* at 133:12–25.  He contacted Mr. Moore telling him the tax returns were needed and "we sent them to our attorneys and our attorneys sent them to you."  *Id.* at 134:10–15.  Moore gave the tax returns to Epling who gave them to counsel.  *Id.* at 134:25–135:3.  Later, Epling had Moore contact Buckley Sandler directly to give the returns to counsel "and they gave him exactly the same ones that I had given because he's the one that put them together."  *Id.* at 135:7–11.

In November 2016, Epling was talking with Moore stating he was going to have his deposition taken and believed that his taxes were "the strong point."  *Id.* at 135:22–136:2.  Epling asked Moore if there was anything to worry about and learned that his personal returns had not been finished.  *Id.* at 136:2–6.  Moore told Epling they weren't finished because Moore did not believe they were going to get the scrutiny of an SEC investigation and wanted to take a little longer to look at them.  *Id.* at 136:7–12.  Epling told Moore they needed to be in with the IRS before his deposition and Moore guaranteed it would be done.  *Id.* at 136:13–16.  The Ferris returns were already done and filed by Moore.  *Id.* at 136:17–19.  Epling never signed them.  *Id.* at 136:19.

28

The only tax returns that Epling had for Ferris were the ones that said "DO NOT FILE"; Epling never filed the returns; Moore filed them from his office. *Id.* at 137:16–19. Moore told him "DO NOT FILE" meant it was a copy that QuickBooks automatically puts on the document. *Id.* at 141:20–25. Epling did not have tax documents; they were all at Michael Moore's office who filed them electronically. *Id.* at 143:6–14.

The court asked Mr. Epling whether he knew at the time he provided information in his declaration that the tax returns Mr. Moore prepared on his behalf had not been filed with the IRS. *Id.* at 149:13–150:4. He testified he did not and was convinced they had because he sent in a $314,000 check to the IRS and got a $315,000 refund the next year. *Id.* at 150:5–8. The fact that the IRS gave him the money back a year later showed Epling that Moore was doing his job, and Epling had no reason not to trust him or not to believe him. *Id.* at 150:8–12. Epling was assured that all of the tax returns with markings "DO NOT FILE" stamped on them had, in fact, been timely filed. *Id.* at 154:20–25. He was assured by Moore. *Id.* at 155:1–2. Epling's declaration states that it was his understanding from Mr. Moore that all the Ferris returns had been prepared in the ordinary course every year and timely filed. *Id.* at 155:13–23. Epling understood the returns were filed without his signature. *Id.* at 155:24–156:1. He never looked at the returns because he would not know what he was reviewing. *Id.* at 156:21–157:2.

Epling learned in November 2016 that none of his personal tax returns had been filed and it came as a complete shock when Moore stated they were not done. *Id.* at 159:1–7. Moore told Epling he would file them in December. *Id.* at 159:17–25. Epling did not understand that there was any problem with Moore filing his personal returns without Epling's signature. *Id.* at 160:11–15. The date on the personal tax returns is the date Epling signed them. *Id.* at 163:21–24. When he signed his personal tax returns he knew that the SEC had made a specific request for his tax returns and was really troubled, but did not take any steps to provide a copy of those signed returns to the SEC. *Id.* at 163:25–164:5.

Epling testified he had not seen anything that convinced him that the Ferris tax returns had not been filed. *Id.* at 164:15–18. However, Epling has seen an IRS document that shows that they have nothing for 2011, 2014, or 2015, but he would "still like to know more information as to how

that document's generated" and questioned whether it was a typo, or the IRS looked it up wrong or had the wrong tax ID number. *Id.* at 165:21–166:2. Epling did not understand the IRS document; Moore has worked for Epling for a long time and Epling found it very hard to believe that he didn't file the returns. *Id.* at 166:3–8. Certified copies of tax returns obtained from the IRS were marked and admitted as Plaintiff's Exhibit A. Epling's personal returns for tax years 2012 through 2015 were all dated May 5, 2017. *Id.* at 167:23–168:12. Mr. Moore signed the returns as the preparer. *Id.* at 168:16–19. Counsel for the SEC established that Epling and Moore signed each of the tax returns and identified the amounts owed in each tax year. *Id.* at 169:5–170:16. Epling did not send a check along with the returns for the amount owing the date they were mailed. *Id.* at 170:25–171:3. He paid the amount owing online probably a week or two prior to the evidentiary hearing. *Id.* at 171:4–11. He had to put together the money to pay the amount owing. *Id.* at 171:16–17. The first time he knew he owed taxes on his personal income taxes was on May 15, 2017. *Id.* at 172:7–8. He understood that Moore was going to prepare and file his personal tax returns each year in a timely manner. *Id.* at 172:23–173:1.

Certified copies of the taxes for Ferris Holding, Inc. and the transcript and verification of non-filing were marked and admitted as Plaintiff's Exhibit B. Counsel gave these documents to him before the evidentiary hearing. *Id.* at 176–177:5. He is not really sure what these documents mean. *Id.* at 177:6–8. He talked to Moore about the tax return transcript for 2013 that shows all zeros. *Id.* at 177:9–16. Moore told Epling that the tax transcript never matched the actual returns that were sent in because it is not a return. *Id.* at 178:12–15. Moore's explanation seemed reasonable because Epling received a refund. *Id.* at 178:17–20. Epling filed his 2016 tax return a week or two before the evidentiary hearing. *Id.* at 180:24–181:4. Epling was not aware that the Ferris tax returns had not been filed by Moore until he got the transcript from the SEC showing all zeros in October 2017. *Id.* at 182:2–25.

On cross-examination by defense counsel, Epling testified that he took the oath taken at his deposition testimony on March 2, 2017, seriously. *Id.* at 188:3–11. Epling gave testimony to the best of his recollection at the time. *Id.* at 188:12–14. He denied that he fabricated the promissory note and other documents that were produced. *Id.* at 188:15–23. He could not think

of any purpose to fabricate those documents. *Id.* at 188:24–189:1. At his deposition, he believed he testified that the loan documents were made in December 2016; he was wrong; it was December 2015; he just made an honest mistake and had no intent to deceive. *Id.* at 189:8–21. Epling found on his computer the December 2017 promissory note, the June 2016 schedule, and the document indicating the promissory note was paid in full once he had the right date and promptly got them to his attorney. *Id.* at 190:13–192:5.

Epling met Moore in 2008 or 2009 when Hemp had hired him to do work for them. *Id.* at 197:6–12. Epling started working with Moore and had him do Epling's taxes. *Id.* at 197:12–16. Epling also used Moore for consulting and "anything I want to do on a financial basis." *Id.* at 197:16–17. Moore has been very valuable and very helpful to Epling over the years. *Id.* at 197:17–18. Moore does all of Epling's bookkeeping and has access to every account. *Id.* at 197:19–22. Before the sanction motions were filed, Epling never had any issues with Moore's performance. *Id.* at 198:9–11. Moore had access to all of Epling's personal and business accounting. *Id.* at 198:12–18. Epling testified he relied on Moore for his entire financial world, including preparation of his tax returns and everything related to finance. *Id.* at 198:25–199:3. Moore has input into everything including everything for Hemp. *Id.* at 199:3–9.

Mr. Epling believed that the copies of the tax return marked "DO NOT FILE" for the years 2012 through 2015 had been filed. *Id.* at 199:16–200:2. Epling understood that if tax returns were electronically filed, he would not have to physically sign the returns. *Id.* at 201:13–16. He had no intent to deceive the SEC about his tax returns. *Id.* at 201:22–25. He provided the SEC with forms so that they could obtain his returns and Ferris tax returns directly from the IRS at least three times. *Id.* at 202:1–8. Epling was absolutely positive that Moore had filed all of the documents and understood that by signing the forms the SEC was going to send to the IRS, the SEC was going to get copies of what had been filed with the IRS. *Id.* at 204:11–16.

On re-direct, counsel for the SEC pointed out that the promissory note was dated in 2015, the document evidencing payment was dated in 2017, and the worksheet was dated in 2016. *Id.* at 207:9–23. Epling testified in response to defense counsel's question that he had been searching the wrong years. He was then asked what years he was searching for if he did not search in 2015,

2016, or 2017.  *Id.* at 208:2–7.  He responded he was not searching for the period of 2015.  *Id.* at 208:8–11.  He was looking for documents related to the loan and there were no loans after the second quarter of 2015.  *Id.* at 208:12–16.

Mr. Epling did not find out about Moore's criminal background until he had worked with him for several years and they already had a great working relationship.  *Id.* at 209:12–15.  Epling was aware that the SEC had sued Moore for fraud.  *Id.* at 209:16–18.  Epling was aware that the SEC sued Moore again for violating the bar that had been imposed on him by the SEC as well as the Public Accounting Accountability Board; he thought so but was not sure.  *Id.* at 209:19–22.  Epling found out from the SEC that Moore lost his CPA license four or five years earlier, perhaps in 2013.  *Id.* at 209:23–210:19.

The court inquired whether Mr. Moore remained Mr. Epling's accountant and tax preparer through the date of the evidentiary hearing.  Epling responded that it was very clear he had to hire someone else to look at everything Moore had done for him for the last many years.  *Id.* at 212:22–213:1.  This realization dawned on him in the last 24 hours.  *Id.* at 213:2–3.  Epling also testified in response to a question posed by the court that he no longer had the computer used to create the promissory note, the worksheet, or the proof of payment.  *Id.* at 214:20–23.  He threw it away in the garbage can after transferring the data onto another device.  *Id.* at 215:2–23.

**C.  Testimony of Michael Moore**

Mr. Moore appeared with counsel at the evidentiary hearing.  He has a degree in accounting from Southern Methodist University in 1976.  *Id.* at 218:24–219:9.  He has an MBA from the University of Dallas in 1981.  *Id.* at 219:10–17.  He currently works at M.J. Moore & Company, which does bookkeeping and tax work.  *Id.* at 219:18–21.  He does not hold a professional license but was previously a CPA.  *Id.* at 219:22–25.  His Nevada CPA license was revoked for cause.  *Id.* at 220:1–5.  Moore could not recall the year.  *Id.* at 220:5–6.

Mr. Moore invoked the Fifth Amendment when asked if he had been previously charged and convicted of fraud.  *Id.* at 220:13–21.  The court inquired of his counsel, Mr. Santacroce, whether he had a good-faith basis for objecting to a question about whether Moore has suffered a felony conviction within the last ten years.  Counsel responded that it was his understanding that

1   Moore could raise his Fifth Amendment rights at anytime during a civil proceeding if he so chose.

2   *Id.* at 220:21–221:3. Santacroce had instructed Moore not to answer the question about whether

3   he has been convicted of a felony within the last ten years.  *Id.* at 221:7–10.  The court inquired

4   what legal basis Mr. Santacroce had to believe that Moore could invoke the Fifth Amendment to

5   a question asking whether he had suffered a felony conviction in the last ten years, which would

6   be public record.  *Id.* at 221:20–23.  Mr. Santacroce acknowledged that a felony conviction would

7   be public record but asserted that Moore did not have to answer the question if it tended to

8   incriminate him.  *Id.* at 221:24–222:3.  The court overruled his objection and directed Moore to

9   answer whether he had a felony conviction within the last ten years, and Moore responded no.  *Id.*

10   at 222:4–9.

11        Mr. Moore continued to assert the Fifth Amendment to questions such as whether he had

12   ever been sued by the SEC.  His counsel continued to assert Moore's right to assert his rights under

13   the Fifth Amendment without providing any rationale how the questions potentially implicated

14   Moore in any crime.  Mr. Santacroce advised the court that he had instructed Moore to assert the

15   Fifth Amendment to all questions posed to him at the evidentiary hearing.  *Id.* at 223:2–6.  When

16   asked how Moore could possibly assert the Fifth Amendment to all questions posed, such as the

17   one about whether he had been sued, Mr. Santacroce merely reiterated it was his understanding

18   that in the Ninth Circuit, a witness could assert the Fifth Amendment privilege in a civil action at

19   any point during the proceedings.  *Id.* at 223:7–14.  Mr. Moore was then asked when he first met

20   Mr. Epling and then invoked his right under the Fifth Amendment upon advice of counsel.  *Id.* at

21   224:17–19.  The court directed the witness to answer notwithstanding the advice of counsel and

22   allowed counsel to have a continuing objection.  *Id.* at 224:22–225:14.

23        After being directed to answer the questions unless the court sustained an objection or

24   determined that the question implicated his Fifth Amendment rights, Moore testified he could not

25   remember when he first met Epling.  *Id.* at 226:3–10.  Moore provided a declaration in this case.

26   *Id.* at 226:20–21.  He was asked a series of questions about the declaration and repeatedly testified

27   he did not remember or did not recall.  Paragraph four of his declaration (ECF No. 108, at 29–34)

28   states that he has provided services to Epling and his entities, including Ferris, since 2012.  *Id.* at

230:16–18. He believed that was an accurate statement. *Id.* at 230:19–20. His declaration states that Epling relied on Moore to prepare financial information for him and Ferris and Hobbes without need of his involvement or supervision; he believes this is a correct statement. *Id.* at 231:11–17. It is ordinary and customary for tax clients to do that. *Id.* at 231:18–20. He did not recall if he prepared tax returns for Epling and his entities, although his declaration states that he prepared tax returns for every year from 2009 to the present after conclusion of the tax year. *Id.* at 232:8–25.

Moore lost his e-filing privileges and believed that Epling assumed Moore's firm was still e-filing returns for him, but they were not. They had to be manually filed. *Id.* at 233:3–10. He did not recall when he lost his e-filing privilege. *Id.* at 233:11–12. He believed the statement in his declaration that before 2011 he was able to electronically file tax returns was accurate. *Id.* at 233:13–21. Epling became his client in 2012 when he no longer had electronic filing privileges. *Id.* at 233:22–234:3. Paragraph five of his declaration states that he believed the returns for both Ferris had been timely filed and he did believe that they had been. *Id.* at 234:12–16. Moore could not electronically file them and thought they had been signed and mailed. *Id.* at 234:17–19. He signed them as the preparer but could not sign for Ferris. *Id.* at 234:21–24. Mr. Epling or someone else had to sign for Ferris. *Id.* at 235:1–3. Mr. Epling would sign his personal tax returns, but Moore did not recall if he did. *Id.* at 235:7–8. Moore believed he personally prepared Epling's personal tax returns but could not recall for which years. *Id.* at 236:11–20. He did not recall if anyone else prepared tax returns for Mr. Epling or Ferris. *Id.* at 236:21–25.

Moore's declaration states that Epling informed Moore that Epling needed to provide his counsel with copies of tax returns for the tax years 2011 through 2016 for Epling, Ferris, and Hobbes. *Id.* at 237:1–5. Moore's declaration states that he instructed his receptionist to send copies of the Ferris tax returns to counsel. *Id.* at 237:10–14. He did not recall why he did not instruct his receptionist, who is his daughter, to send a copy of Epling's personal returns. *Id.* at 237:15–21. His declaration states that he did not recall if his receptionist sent stamped copy from the file or PDF copies directly from the tax preparation software. *Id.* at 237:22–25.

When asked whether his office software printed tax returns with the "DO NOT FILE" watermark on it, Moore responded that "it will if you tell it to . . . if you don't click the button, it

doesn't do it." *Id.* at 241–242:3.  When asked what records Moore's business kept to prove that tax returns have been filed with the IRS, Moore responded that since they had been manually filed, they would send returns in by certified mail.  *Id.* at 244:16–19.  He did not believe that happened with respect to any of Ferris' returns because Mr. Epling would have had to come into the office and sign the returns; then the firm would prepare a certified mail and send it out, but Moore did not believe that happened.  *Id.* at 244:20–25.  He did not know how the Ferris returns were sent to the IRS.  *Id.* at 245:3–4.  He knew of no document that would prove the tax returns were, in fact, transmitted to the IRS at any time, although "we could pull a transcript up."  *Id.* at 245:5–12.  When asked by the defendants' counsel to provide copies of tax returns for Epling and Ferris, he instructed his "crew to pull up copies of the returns and get 'em out."  *Id.* at 246:5–16.  When asked if Mr. Epling ever saw the tax returns for himself personally, or for Ferris before they were filed, Mr. Moore responded, "that's kind of a crazy question.  I mean, the taxpayer would have to see his returns if he's gonna sign 'em and mail 'em in now, wouldn't he?"  *Id.* at 247:10–14.

Mr. Epling received a substantial refund in 2014 based on the 2012 tax return he and his staff prepared for Ferris.  *Id.* at 250:1–12.  Epling would have had to sign that return because Moore could not electronically file it.  *Id.* at 250:14–16.  Moore could not recall whether he had told Epling each year that his tax returns had been prepared and filed in a timely manner.  *Id.* at 251:6–8.  Moore believed the statement in his declaration that he had been working on Epling's personal returns but had not finished them because he wanted to take another look at them because they could be subject to SEC's scrutiny was correct.  *Id.* at 251:23–252:3.  Moore could not mail in Mr. Epling's personal tax returns and this has been true since 2012.  *Id.* at 252:19–16.  Moore did not ever recall telling Epling prior to May 5, 2017, that his personal tax returns had been transmitted to the IRS.  *Id.* at 258:25–259:3.  Mr. Epling was responsible for mailing them to the IRS.  *Id.* at 259:8–10.  Moore believed that the tax returns for Ferris had been filed because he believed they had been given to Epling who had signed them and mailed them.  *Id.* at 260:11–15.  Moore believed that the IRS prepared a substitute return for Ferris for the tax year 2013.  *Id.* at 260:19–261:10.

Mr. Moore testified one could log into the IRS website and get transcripts and see when

returns were received and posted by the IRS.  *Id.* at 262:23–25.  Moore sees a lot of returns that wind up going in the trash or on a desk that belongs to someone who quit, got fired, or died, and sometimes returns are "just kinda like in processing."  *Id.* at 263:1–5.  Moore also testified, "it's always possible that returns went to the lock box.  And, at the end of the day, the employees who don't finish their work that day throw everything in the trash."  *Id.* at 266:14–17.

The miscommunication with Mr. Epling that needed to be investigated and ameliorated was Mr. Epling's impression that all of his returns had been e-filed for business and personal when Moore's firm was not e-filing, but manually filing returns.  *Id.* at 270:7–13.  When asked to explain why his declaration was very specific, but his recollection on the stand was not, Moore testified, "I don't recall specific dates or specific conversations or a lot of things."  *Id.* at 271:2–6.

On cross-examination from counsel for the defendants, Moore testified that an accountant would use a "DO NOT FILE" watermark on a computer program because sometimes a taxpayer will "stiff ya'" and wants to look at his returns before they are filed.  The preparer gives the client a copy that says "DO NOT FILE" for review and if everything is okay, the preparer produces the copy that gets submitted to the IRS.  *Id.* at 273:8–14.  The firm sends a "DO NOT FILE" copy when a client requests a copy so that there is no misunderstanding about what the document is.  *Id.* at 273:16–22.  There's nothing unusual about doing that.  *Id.* at 274:6–8.

**D.  Testimony of Leighton R. Koehler**

Mr. Koehler is an attorney and CPA licensed in Nevada.  *Id.* at 283:3–5.  He has been an attorney and a CPA since 2012.  *Id.* at 283:6–7.  He received a Master's Degree in Accounting from Southern Utah University in 2004.  *Id.* at 283:9–10.  He worked for Ernst & Young as a public accountant, auditing casinos in Las Vegas for two-and-a-half years preparing large, complex, consolidated corporate tax returns.  *Id.* at 283:10–13.  He went to night school at the Boyd School of Law and worked at the IRS in Las Vegas as a senior revenue agent with Small Business Self-Employed Division and Large Business International Division for about six-and-a-half years.  *Id.* at 283:14–18.  As a senior revenue agent, he did examinations mostly on the assessment side; got returns assigned, applied tax law, verified the information on the returns, and tried to come up with an agreed case with the taxpayers at the end.  *Id.* at 283:20–284:1.

Since leaving the IRS in 2013, he has worked as an estate planning attorney, but primarily as a tax controversy attorney who also does a bit of tax consulting as well. *Id.* at 284:3–5. He considers himself an expert in the area of the Internal Revenue Service and tax work. *Id.* at 284:6–8. He has never testified as an expert before. *Id.* at 284:9–10. He was contacted to provide evaluation and assistance and testimony about four weeks prior to the hearing. *Id.* at 284:11–15. He had knowledge and expertise in IRS forms, processes and procedures for the last ten years or so. *Id.* at 284:25–285:3. He was provided with a copy of Exhibit B, an Account Transcript for Form 1120 for the year ended December 31, 2012 for Ferris Holding, Inc. *Id.* at 286:2–4. There was also an Account Transcript Form 1120 for the year ending December 31, 2013, for Ferris, and a Tax Return Transcript for the same period for Ferris. *Id.* at 286:6–12. He has been familiar with these documents since 2007 when he was trained by the IRS to review them and has an in-depth understanding of what they are. *Id.* at 286:15–21. In preparing for his testimony, he reviewed the Internal Revenue Manual for IRS procedures regarding how these documents are calculated by the IRS upon receipt of a return. *Id.* at 286:22–25.

The December 31, 2013 certified Account Transcript for Ferris has a lot of zero entries. *Id.* at 288:2–19. Before all the zeros, the transcript states "NET RECEIPTS INFORMATION FROM RETURN OR AS ADJUSTED." *Id.* at 288:20–289:6. Mr. Koehler explained this is information that either sourced from a tax return, or has been adjusted by the IRS before being placed in the format on the form. *Id.* at 289:7–10. An Account Transcript is not meant to be a reflection of the tax return. *Id.* at 289:14–16. It is meant to be a transactional history of the action the IRS has taken related to a tax file. *Id.* at 289:16–17. The Account Transcript contains a Code 150 which reflects the tax return was filed. *Id.* at 290:2–16. Another reason Tax Code 150 would appear on the form is if a substitute for return was prepared. *Id.* at 290:18–19. He did not believe the December 31, 2013 Account Transcript was a substitute return because there were no audit codes on the form. *Id.* at 290:19–24. A substitute for return is when the IRS prepares a return on behalf of a taxpayer when someone has not filed a tax return. *Id.* at 291:1–3. Typically, the IRS has to have income information that they have received to prepare a substitute, for example, a 1099 or W-2 from a third party. *Id.* at 291:3–11.

A Tax Return Transcript is supposed to reflect the relevant important numbers that are on the tax return when it is received by the IRS and scanned into their system. *Id.* at 292:1–7. The December 31, 2013 Tax Return Transcript for Ferris contains the statement, "The following items reflect the amount as shown on the return as filed or as adjusted during the return processing. It does not include adjustments to the account after return settlement." *Id.* at 292:19–24. There are many reasons why a tax return requires mandatory manual review and editing of the information from the originally-filed return prior to entering the information on a Tax Return Transcript. *Id.* at 293:1–19.

If the IRS receives an all-zero return, they will typically pull it because it is a frivolous filing. *Id.* at 293:20–24. This would trigger an automatic review. *Id.* at 294:2–3. The Ferris Tax Return Transcript does not have audit codes on it, so Koehler believed "it is possible that these numbers are not reflective of what is on the original return." *Id.* at 294:9–12.

The codes on the Account Transcript indicate the return was filed, an extension of time was granted, there was a credit from a prior period which is consistent with the 2012 transcript and the 2012 return, interest was credited to the account because it took the IRS too long to issue the refund, and a refund was issued. *Id.* at 294:20–295:4. The fact that interest was issued implies there was a tax return filed and the IRS took more than 45 days to respond, so interest began accruing on the total amount of the refund. *Id.* at 295:5–9.

The Tax Return Transcript has a document locator number for the original return which indicates the original return was received and processed at the Ogden Service Center. *Id.* at 295:22–296:25. The document also has numbers which provide a roadmap to find the actual source return that the IRS received and processed. *Id.* at 297:2–9. The original return would be very easy to get because the transcript tells exactly where it is. *Id.* at 298:9–10. One would need the filed tax return to verify the Tax Return Transcript is accurate. *Id.* at 299:6–9.

On cross-examination, Mr. Koehler testified that the December 31, 2013 Ferris return was filed May 12, 2014. *Id.* at 300:1–4. This is the day the IRS logged the tax return into its system as received. *Id.* at 300:5–9. The transcript shows a tax payment on April 18, 2013, of $314,448.00. *Id.* at 300:10–21. If the IRS received a payment without a corresponding return, it would hold

onto the payment until a return is filed. *Id.* at 300:22–301:2. Mr. Koehler was not testifying about any documents other than the Tax Return Transcript and the Tax Account Transcript. *Id.* at 301:21–23.

In response to questions posed by the court, Mr. Koehler testified regarding the RAIVS Request for Verification of Non-filing Taxpayer Accounts for Ferris, and the IRS' corresponding certification of tax documents. The verification indicates that a request was made on October 18, 2017, and the IRS certified on April 11, 2018, that it conducted a search of records for Ferris' tax returns for the tax years 2011, 2014, 2015, and 2016, and found no records of such a return. *Id.* at 304:9–306:3.

## **DISCUSSION**

Terminating sanctions are sought against Epling, Ferris, and Hobbes for failing to timely produce loan documents, and misleading counsel for the SEC about the personal and business tax returns sought by the SEC in discovery. The SEC maintains that terminating sanctions are warranted against Epling, Ferris, and Hobbes "for repeated incidents of fabrication of evidence." The SEC also seeks sanctions against Epling and Perlowin for providing false deposition testimony about whether there were any documents memorializing the $1.8 million in loans made by Epling/Ferris to Perlowin/Hemp. Defendants concede terminating sanctions may be imposed for abusive litigation practices if the court finds a pattern of deception.

At the February 1, 2018 hearing on oral arguments on the SEC's two motions for sanctions, the court granted the SEC's request for sanctions, but reserved decision on the severity of the sanctions until taking testimony from Messrs. Epling, Perlowin, and Moore. It was clear from the moving and responsive papers that all of the defendants failed to comply with their discovery obligations. However, it was less clear from a review of the papers and arguments of counsel, what sanctions were appropriate and proportional to the violations.

Having conducted a lengthy evidentiary hearing, and thoroughly reviewed the moving and responsive papers with supporting exhibits and declarations, the court will deny the SEC's request for terminating sanctions in favor of severe, but lesser available sanctions. The court finds defendants should be precluded from offering any evidence at hearing, in motion practice, or at

trial related to the loan documents produced after Messrs. Epling and Perlowin were initially deposed in this case.  The court also finds that the jury should be instructed that the defendants failed to comply with their discovery obligations.  Additionally, the jury should be instructed that Epling deceived counsel for the SEC and defense counsel by falsely representing that his personal tax returns for tax years 2012, 2013, and 2014 that he produced in response to the SEC's discovery requests were "as filed" copies.  The jury should be instructed that they may consider evidence of the defendants' discovery violations and Epling's deception about his personal tax returns along with all other evidence in the case in reaching their verdict.

## I.   APPLICABLE LEGAL STANDARDS

### A.  Sanctions Under Rule 37(c)

Rule 37 provides, in relevant part:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed. R. Civ. P. 37(c)(1).  Rule 37(c)(1) is a "self-executing, automatic" sanction designed to provide a strong inducement for disclosure.  *Goodman v. Staples The Office Superstore*, 644 F.3d 817, 827 (9th Cir. 2011).  Rule 37(a)(3) explicitly provides that an evasive or incomplete disclosure, answer, or response to a discovery obligation "is to be treated as a failure to disclose, answer, or respond." *Id.*  "The only exceptions to Rule 37(c)(1)'s exclusion sanction apply if the failure to disclose is substantially justified or harmless." *Id.*

In the Ninth Circuit, district courts are given broad discretion in supervising the pretrial phase of litigation.  *Jeff D. v. Otter*, 643 F.3d 278, 289 (9th Cir. 2011); *Cont'l Lab. Products, Inc. v. Medax Int'l, Inc.*, 195 F.R.D. 675, 677 (S.D. Cal. 2000).  The Ninth Circuit gives "particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)," which is "a recognized broadening of the sanctioning power."  *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 859 (9th Cir. 2014) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)).

The Ninth Circuit reviews a district court's decision to sanction for a violation of the

discovery rules for abuse of discretion. *Yeti by Molly*, 259 F.3d at 1106. The Ninth Circuit will not reverse a district court's Rule 37 discovery sanction in the absence of a definite and firm conviction the court made a clear error in judgment. *Valley Engineers, Inc. v. Elec. Eng. Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998).

### B. Preclusion Sanctions

Rule 37(c)(1) authorizes evidentiary preclusion sanctions for a litigant's failure to comply with Rule 26's disclosure requirements, even where they would preclude a litigant's entire claim or defense. *Yeti by Molly*, 259 F.3d at 1106; s*ee also Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1169 (9th Cir. 2012) (affirming district court's order striking answer and entering default judgment as sanction under Rule 37). Before imposing preclusion sanctions that amount to a terminating sanction, the district court must make a finding of willfulness, fault, or bad faith, and consider the availability of lesser sanctions. *R&R Sales, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012).

### C. Dispositive Sanctions Under Rule 37

The Ninth Circuit has established a five-part test "to determine whether a case dispositive sanction under Rule 37(b)(2) is just." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). Before dismissing a case or declaring a default the court must consider: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Hester*, 687 F.3d at 1169 (citing *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 788 (9th Cir. 2011)); *see also Conn. Gen. Life Ins.*, 482 F.3d at 1096. This five factor inquiry is not a mechanical test; it merely provides the "court with a way to think about what to do, not a set of conditions precedent for sanctions or a script the district court must follow." *Id*. Because terminating sanctions are so severe, only a finding of willfulness, fault, or bad faith will justify terminating sanctions. In most cases the first two factors weigh in favor of the imposition of sanctions, while the fourth factor cuts against dismissal.

Due process requires that neither dismissal nor preclusion of evidence that is tantamount

41

to dismissal may be imposed when failure to comply with discovery obligations is due to circumstances beyond the recalcitrant party's control. *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir. 1980). The Ninth Circuit has specifically encouraged dismissal, however, where the district court determines "that counsel or a party has acted willfully or in bad faith in failing to comply with rules of discovery or with court orders enforcing the rules or in flagrant disregard of those rules or orders." *Sigliano v. Mendoza*, 642 F.2d 309, 310 (9th Cir. 1981) (quoting *G-K Properties v. Redevelopment Agency*, 577 F.2d 645, 647 (9th Cir. 1978)).

### D. Availability of Lesser Sanctions

The fifth part of the terminating sanctions test requires the court to consider the availability of less drastic sanctions. The Ninth Circuit has identified three factors to assess whether a district court adequately considered less drastic sanctions: (i) whether the court has considered lesser sanctions; (ii) whether it tried them; and (iii) whether it warned the recalcitrant party about the possibility of case-dispositive sanctions. *Conn. Gen Life Ins.*, 482 F.3d at 1096.

Ninth Circuit decisions "suggest that a district court's warning to a party that his failure to obey the court's order will result in dismissal can satisfy the 'consideration of alternatives' requirement." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1991). The key factors the court should consider are prejudice and availability of lesser sanctions. *Id.* However, the fact that a court does not implement a lesser sanction before imposing terminating sanctions is not dispositive. "It is just one factor." *Hester*, 687 F.3d at 1170. A district court may "reasonably conclude that additional lesser sanctions would be pointless." *Id.* (quoting *Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112, 1116–17 (9th Cir. 2004); *Anheuser–Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 352 (9th Cir. 1995)). Lesser sanctions may appropriately be rejected "where the court anticipates continued deceptive misconduct." *Id.*

## II.   ANALYSIS AND DECISION

To analyze what sanctions are appropriate for the defendants' multiple discovery failures, some understanding of the nature of the underlying claims and defenses is needed to determine the significance of the defendants' discovery violations and what sanctions are warranted. The district judge's Order (ECF No. 123) denying the SEC's motion for partial summary judgment and the

Epling defendants' motion for judgment on the pleadings outlines nature of the parties' claims and defenses and is briefly summarized in this order.

In December 2012, Epling had a breakfast meeting with two of his business partners. The conversation was recorded on an iPhone unbeknownst to Epling. The conversation turned to Epling's involvement with co-defendant Hemp, Inc.[2] At this breakfast meeting, Epling admitted that he and co-defendant Perlowin "run Hemp, Inc." Epling explained he avoided having any official title with Hemp (1) because of the association, and (2) because an officer or a director or controller of the company is an affiliate who can only sell an amount of stock equal to 1% of the issued shares every 90 days. Epling told his breakfast companions that he had been and would continue to unload a lot more than 1% of the issued shares. Epling later testified at his deposition in this case that everything he told his business partners at that breakfast meeting was incorrect and he was "just playing" with them because he was "totally done" with them.

At the partial summary judgment stage, the SEC argued that the Epling defendants violated Section 5 of the Securities Act. The SEC's theory of the case is that Epling admitted during the breakfast conversation that he and Perlowin controlled Hemp. Epling's control over Hemp made him an affiliate bound by SEC Rule 144, which limits the volume of shares an affiliate may lawfully sell within a 90-day period. At the breakfast meeting, Epling admitted that he was selling and would continue to sell securities in excess of the 1% limitation. The uncontroverted evidence in the record showed no Forms 144 had ever been filed by Epling, Ferris, or Hobbes. Thus, the SEC maintains that by failing to abide by the volume limitations and notice-filing requirement of Rule 144, the Epling defendants fell outside the safe harbor provisions of Rule 144 as a matter of law and qualified as underwriters. As such, the Epling defendants were required to register their sales of stock and violated Section 5 of the Securities Act by failing to do so.

In her order denying the SEC's motion for partial summary judgment, the district judge determined there were genuine issues of material fact that precluded granting partial summary judgment in favor of the SEC on its third cause of action for several reasons. First, she found that

_____

[2] The Hemp defendants are Hemp, Inc., Bruce Perlowin, Barry K. Epling, Ferris Holding, Inc., and Hobbes Equities, Inc.

1    falling outside the Rule 144 safe harbor provision does not automatically qualify one as an

2    underwriter.  Whether a person qualifies as an underwriter is a fact-intensive analysis inappropriate

3    for determination at the summary judgment stage.  Additionally, the district judge found that the

4    contradictions between Epling's recorded breakfast conversation and his testimony under oath in

5    this case were issues of credibility for the jury to decide.  Epling testified under oath that he lied

6    to his ex-business partners during that breakfast meeting.  The district judge found that because

7    Epling was not under oath during the breakfast meeting but was under oath when he testified that

8    he lied to his ex-business partners, his credibility was at issue and issues of credibility were for the

9    jury to decide.

10          **A.  The Loan Documents**

11          It is undisputed that Perlowin was asked at his March 3, 2017 deposition whether there was

12   any documentation of the series of loans made by Epling/Ferris to Perlowin/Hemp.  Perlowin

13   testified that there was no loan agreement or other documents memorializing the agreement to loan

14   Perlowin/Hemp more than $1.8 million in a series of loans over a three-to-four-year period

15   beginning in 2012 through 2015.  However, at his March 2017 deposition, Perlowin testified he

16   had seen a list of payments made by Epling on Hemp's behalf on Epling's computer.  Perlowin

17   was specifically asked by counsel for the SEC at his March 2017 deposition what written

18   documents he had seen other than what was on Epling's computer screen and testified "none."

19          Epling was deposed on March 2, 2017 and asked a series of questions concerning payments

20   he made over the course of several years to third party vendors on behalf of Perlowin and/or Hemp

21   totaling more than $1.8 million.  He was asked whether there was any written loan agreement and

22   testified there was none.  However, he also testified at his deposition that there was an agreement

23   in December 2016 that stated what the loans were for, what the interest was, and that Perlowin

24   paid the amount owed in full.  Epling testified that prior to December 2016, there was nothing in

25   writing memorializing the loan agreement.  Counsel for the SEC demanded a copy of the

26   December 2016 loan agreement Epling testified memorialized the parties' agreements.  After

27   Messrs. Perlowin and Epling were deposed, the SEC served the Epling defendants with a request

28   for production requesting "all agreements between you and any of the following: Bruce Perlowin,

44

Hemp, Inc., and/or Marijuana, Inc." and "copies of all documents related to the 2016 transaction in which Bruce Perlowin and/or Hemp, Inc. repaid one or more loans to Barry K. Epling, Ferris Holding, Inc. and/or Hobbes Equities, Inc. A copy of the SEC's fourth request for production of documents to Epling, dated March 16, 2017, is attached as Exhibit 14 to the SEC's motion (ECF No. 92-16).

On April 5, 2017, the Epling defendants served responses and objections to the SEC's third and fourth set of document requests and produced documents Bates-stamped Hemp-007-0000-6062 through 6074. A copy of the letter from Timothy Coley to Amy Oliver, counsel for the SEC dated April 5, 2017, is attached to the SEC's first motion for sanctions as Exhibit 16. The documents served on April 5, 2017, consisted of: (1) a December 30, 2016 letter from Kim Brady to Michael Ajzenman instructing Ajzenman regarding stock transfers to Bruce Perlowin for loan payment; (2) a January 4, 2017 letter from Brady to Ajzenman instructing him regarding stock transfers to Perlowin; (3) a October 31, 2016 Book Statement reflecting issuances of securities; (4) a December 29, 2016 Issuance Resolution reflecting Hemp, Inc.'s issuance of common stock to Perlowin; (5) a December 29, 2016 third-party release form signed by Bruce Perlowin certifying that the Book Statement for 108,962,370 shares of the common stock of Hemp, Inc. in his name were the sole and exclusive property of Ferris Holding, Inc.; (6) a December 19, 2016 email regarding issuance of stock to Perlowin as partial repayment of a loan payment in the amount of $2,438,763.43; and (7) Book Statements, Transfer Journals and Hemp, Inc. stock certificates related to these transactions.

The declaration of counsel for the SEC stated that, included in the April 5, 2017 document production was a document entitled Promissory Note Worksheet, dated June 1, 2016, reflecting a total loan of $1,853,302.89. Bates-stamped Hemp-007-0000-6074. However, a copy of the Promissory Note Worksheet was not attached with the documents included in the SEC's Exhibit 16 (ECF No. 92-18).

Mr. Perlowin's deposition was continued to April 27, 2017. At his continued deposition, Perlowin was asked additional questions about the $1.8 million loan and the loan documents produced by the defendants on April 5, 2017, which were marked as Deposition Exhibit No. 68.

1   Perlowin testified that there were no other documents that he was aware of memorializing the loan

2   payments made by Epling other than the contents of Exhibit 68.

3        On May 12, 2017, counsel for the defendants sent the SEC a disc containing documents

4   responsive to the SEC's: (1) January 4, 2017 first request for production of documents to the Hemp

5   defendants; (2) February 17, 2017 third request for production of documents to Epling, Ferris, and

6   Hobbes; and (3) March 6, 2017 third and fourth request for production of documents to the Hemp

7   defendants.  *See* letter from Timothy J. Coley, counsel for the defendants to counsel for the SEC

8   (ECF No. 92-20).  Specifically, the defendants produced: (1) a December 15, 2015 Promissory

9   Note; (2) a document entitled "PAYMENT IN FULL OF ALL LOANS AND INTEREST TO

10  FERRIS HOLDING, INC. BY BRUCE PERLOWIN" dated January 5, 2017; and (3) a document

11  entitled Promissory Note Worksheet dated June 1, 2016.  These documents were produced after

12  Perlowin was deposed twice on March 3 and April 27, 2017.  It is undisputed that the documents

13  were responsive to the SEC discovery requests.  It is also undisputed that these documents support

14  defendants' defenses and therefore should have been disclosed as required by Rule 26(a)(1).

15       On June 5, 2017, counsel for the SEC wrote a letter to counsel for the defendants expressing

16  the SEC's concern that the testimony of Epling and Perlowin indicating no other documents

17  existed was contradicted by the documents produced May 12, 2017.  A copy of the May 12, 2017

18  letter from Amy Oliver (counsel for the SEC) to Timothy Coley (counsel for the defendants) is

19  attached to the SEC's first motion  as Exhibit 19 (ECF No. 92-21).  The parties' efforts to resolve

20  their disputes were unsuccessful and the first motion for sanctions was filed.

21       The SEC claims that the documents produced on April 5 and May 12, 2017, directly

22  contradict Perlowin and Epling's deposition testimony and amount to perjury and fabricated

23  evidence.

24       At the evidentiary hearing, Perlowin testified that there were hundreds of loans made by

25  Epling to Hemp between approximately 2012 and 2015.  Ninety percent of the time Epling paid a

26  bill for Perlowin/Hemp.  Perlowin was also quite clear that he did not document the payments at

27  the time of each loan.  He testified at his March 2017 deposition that he had seen a list of payments

28  made by Epling on Epling's computer.  However, he also testified at the evidentiary hearing that

he had no knowledge of the Promissory Note Worksheet dated June 1, 2016, at the time of his deposition on March 3, 2017.  He testified that he was "not really" aware that he had repaid Mr. Epling over $1.8 million in December 2016 and January 2017.  At the evidentiary hearing, Perlowin acknowledged that his signature was on the document titled "Payment in Full of All Loans and Interest to Ferris Holding, Inc. by Bruce Perlowin" dated January 5, 2017.  However, the declaration he provided supporting his opposition to the SEC's motion for sanctions said he was unaware of the existence of these documents that were produced on May 12, 2017, by his counsel.

On the witness stand at the evidentiary hearing, he suddenly remembered.  At the evidentiary hearing he testified he now recalled that he signed documents at Epling's house while sitting in Epling's living room going over a bunch of stuff.  He went on to testify that he recalled these details sometime within the last six months, then contradicted himself stating he recalled these details in the last 60, 90, or maybe 30 days.  Moments later, he testified that his recollection was refreshed by talking with Epling two weeks prior to the evidentiary hearing.  Mr. Perlowin's testimony of his sudden recent recollection was simply not credible.  The court finds Perlowin was not credible when he testified at the evidentiary hearing that he did not recall signing the January 5, 2017 document indicating he had been paid in full for a series of loans with interest in excess of $2 million when he testified at his deposition on March 3, 2017.  It is not credible that Perlowin would not recall being paid in excess of $2 million less than 60 days before he was deposed.  The court also simply does not believe Perlowin evidentiary hearing testimony that his recollection was refreshed and he now recalled where he signed the document somewhere between six months, 90 days, 60 days, 30 days, or two weeks before his evidentiary hearing testimony.

Perlowin did not produce documents reflecting his instructions to Hemp employee Kim Brady regarding the transfer of stock to repay the loan even though Perlowin testified he told Ms. Brady to look for anything needed to comply with the SEC's discovery requests and these loan transactions.

The court also finds that Epling's testimony at the evidentiary hearing was not credible in several respects.  Epling testified that the loan payments to Perlowin and Hemp began in 2012 or

2013.  He acknowledged that he had previously testified that he did not have a written loan agreement, but claimed the testimony was truthful at the time he gave it, but not truthful at the time of the evidentiary hearing.  Epling acknowledged that at his deposition, he testified there was a loan agreement in December 2016, but now recalled that it was the year before in December 2015.  Because he had the wrong year, he claimed at the evidentiary hearing that he was unable to locate the documents that were eventually produced in April and May 2017 through his counsel.  His testimony that he only realized after he was questioned by the SEC investigator, and after he was deposed in this case, that he had been incorrectly answering questions that the series of loans were undocumented was wrong is not credible.  Epling claimed that he had a revelation that he had been incorrectly testifying when counsel for the SEC asked a question about whether the loan agreements were "ever" documented.  He acknowledged at the evidentiary hearing that his testimony sounded self-serving because the documentation was done six months after the last loan was given.  However, Epling claimed that he had just "forgotten" that there were other documents that memorialized the parties' loan agreements.

The court finds the documents that were produced April 5 and May 12, 2017 were documents which should have been disclosed in the defendants' initial disclosures pursuant to Rule 26(a)(1).  The defendants were obligated to disclose documents relevant to their defenses, and obligated to sign the initial disclosures certifying the disclosures were accurate and complete under penalty of Rule 26(g).  The defendants also failed to make a reasonable inquiry to locate and produce these documents after the SEC sent formal written discovery requests.  Moreover, because Epling testified that he destroyed the computer on which the Promissory Note Agreement, Promissory Note Worksheet, and the Payment in Full document were created, there is no way to forensically establish when the documents produced April 5 and May 12, 2017 were created.  Sanctions under Rule 37(c)(1) are therefore warranted.  Defendants have not met their burden of establishing that the failure to timely disclose and produce these documents was substantially justified or harmless.  Accordingly, preclusion sanctions are warranted.  The defendants may not use the documents produced April 5 and May 12, 2017 at hearing, in motion practice, or at trial.

/ / /

## B.  Mr. Epling's Personal Tax Returns

The SEC seeks terminating sanctions against the Epling defendants asserting Epling's personal tax returns and Ferris tax returns were fabricated in response to the SEC's request for production.  The SEC claims it was misled about whether the returns already existed and whether they had been filed with the IRS.  The SEC served its request for production of documents for the tax returns on February 17, 2017.  The request for production sought the Epling, Ferris, and Hobbes returns for the years 2011 through 2016.  The defendants responded to the request for tax returns on March 20, 2017, objecting, but stating without waiving their objections, the defendants would "upon conducting a reasonable search, produce copies of responsive documents related to the transactions alleged in the complaint that are within their possession, custody, or control, and have not been previously provided to Plaintiff."  Defendants' response to the SEC's request for production is attached as Exhibit 4 (ECF No. 97-6) to the second motion for sanctions.  On March 20, 2017, the Epling defendants produced a single tax return for Ferris.  Epling's personal tax returns were not produced.  Counsel for the SEC therefore followed up with opposing counsel requesting supplementation of the response to request for production of documents with responsive documents or a confirmation that there were no responsive documents other than the 2012 tax return for Ferris.  On April 13, 2017, counsel for the parties conducted an in-person meet-and-confer and counsel for Epling indicated that Ferris would amend and/or supplement their discovery responses the following week.  On May 2, 2017, counsel for Epling and Ferris sent an email to counsel for the SEC stating:

> In response to your request for further tax returns, Mr. Epling has conducted a diligent search of his records, along with those of Hobbes and Ferris, pursuant to which he has located additional tax returns for years 2012–15 for himself, Ferris, and Hobbes (Ferris submits a consolidated filing on behalf of itself and Hobbes).  Tax year 2016 is not yet complete.  We are still in the process of collecting these documents and intend to produce them later this week or next week following our review.  Subject to our previously asserted objections, neither Mr. Epling, nor Hobbes, nor Ferris is aware of any other responsive tax returns within his possession, custody or control.

A copy this email is attached to the SEC's second motion for sanctions as Exhibit 2 (ECF No. 97-4).

The court finds Epling deceived counsel for the SEC and his own counsel by falsely

49

claiming he had just located additional personal and Ferris tax returns for tax years 2012 through 2015. The court also finds that Epling deceived counsel for the SEC and his own counsel by falsely claiming that he had produced as-filed copies of his personal tax returns for the years 2012 through 2015. Epling knew in November 2016 that Moore had not filed his personal tax returns. Certified copies of the tax returns the SEC obtained directly from the IRS reflect that all the returns were filed on May 5, 2017, just prior to the evidentiary hearing. The tax returns show that Epling owed substantial taxes in each tax year. In 2012, Epling owed the IRS $17,650. In 2013, Epling owed $19,070. In 2014, Epling owed $23,821, and in 2015, Epling owed $48,998. It is not credible that he believed his returns had been filed when he had not signed the returns. It also is not credible that he thought the returns had been filed when he owed this amount in tax liability to the IRS but had not paid any of his taxes. However, Epling's personal tax returns which were produced to the IRS on May 12, 2017, undated, unsigned and with the watermark "DO NOT FILE" appear identical to the certified copies of the tax returns which were eventually filed May 5, 2017. The court therefore concludes that although the jury should be instructed about Epling's deception, his deception about his personal tax returns does not threaten to interfere with the rightful decision of this case on the merits.

### C. Ferris' Tax Returns

Mr. Epling signed IRS consent forms allowing the SEC to obtain the Ferris tax returns directly from the IRS. It is now undisputed that Ferris did not file tax returns for the tax years 2011, 2014, 2015, and 2016. The SEC received account transcripts for Ferris for the tax years ending December 31, 2012, and December 31, 2013. Counsel for the SEC interpreted these account transcripts and tax return transcripts which contain a number of zero entries incorrectly. As Mr. Koehler explained, the transcripts are documents prepared by the IRS. The face of the December 31, 2013 certified account transcript states, "NET RECEIPTS INFORMATION FROM RETURN ARE AS ADJUSTED." As Mr. Koehler explained, this is information that the IRS took from a tax return that has been adjusted and is meant to be a transactional history of the action the IRS has taken. The form itself contains a code indicating Ferris' tax return for 2013 was actually filed. The account transcripts for these two years are also consistent with Epling's testimony that

1    he paid in excess of $300,000 in taxes to the IRS before the Ferris tax return was filed, and later

2    received a refund in excess of $300,000 for the subsequent tax year.

3         Again, the court finds that Epling deceived counsel for the SEC and defense counsel that

4    all of the tax returns for Ferris except for 2016 had been filed.  However, the SEC now has certified

5    records from the IRS indicating that no tax returns were filed for certain tax years.  Additionally,

6    Koehler's testimony has established exactly where the 2012 return is located at the Ogden Service

7    Center.  Thus, the SEC is able to obtain the original return and compare it to the information on

8    the transcript.

## CONCLUSION

10        The defendants' conduct in this case is egregious and has wasted a huge amount of judicial

11   and party resources.  Counsel for the defendants making the discovery disclosures declined to

12   defend the motions for sanctions for the obvious reason that he felt conflicted having made the

13   representations to counsel for the SEC based on what his clients told him.  Another law firm was

14   hired to defend the motions and attend the hearings on the motions.  Severe sanctions are

15   warranted.  However, because the defendants' discovery violations do not threaten the rightful

16   decision of the case on the merits, the court will not recommend terminating sanctions.  Having

17   reviewed and considered the matter and for the reasons explained,

18        **IT IS ORDERED** that:

19        1.  The SEC's Motions for Sanctions (ECF Nos. 92, 97) are **GRANTED in part** and

20             **DENIED in part**.  The SEC's request for terminating sanctions is **DENIED**.

21        2.  The following sanctions are imposed:

22             a.  The defendants are precluded from offering any evidence at hearing, in motion

23                  practice, or at trial related to the loan documents produced after Messrs. Epling

24                  and Perlowin were initially deposed in this case.  Specifically, they shall be

25                  precluded from offering any evidence of the documents produced to the SEC

26                  on April 5, 2017, and May 12, 2017.

27             b.  The jury should be instructed that the defendants failed to comply with their

28                  discovery obligations.  Additionally, the jury should be instructed that Epling

deceived counsel for the SEC and defense counsel by falsely representing that his personal tax returns for the years 2012, 2013, and 2014, which were produced in response to the SEC's discovery requests were "as-filed" copies.

    c.  The jury should be instructed that they may consider evidence of the defendants' discovery violations and Mr. Epling's deception about his personal tax returns along with all other evidence in the case in reaching their verdict.

DATED this 30th day of April, 2019.


_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE